**GERSHWIN PUBLISHING CORPORATION, Plaintiff-Appellee,**

v.

**COLUMBIA ARTISTS MANAGEMENT, INC., Defendant-Appellant,**

and

**Community Concerts, Inc., Defendant.**

**No. 606, Docket 35260.**

United States Court of Appeals, Second Circuit.

Argued April 19, 1971.

Decided May 24, 1971.

Stephen Sayre Singer, New York City (Coudert Brothers and Carleton G. Eldridge, Jr., New York City, on the brief), for defendant-appellant.

Herman Finkelstein, New York City (Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison and Jay H. Topkis, and Cameron Clark, New York City, on the brief), for plaintiff-appellee.

Before FRIENDLY, Chief Judge, ANDERSON, Circuit Judge, and LEVET, District Judge.*

ANDERSON, Circuit Judge:

The American Society of Composers, Authors, and Publishers (ASCAP) brought this copyright infringement action against Columbia Artists Management, Inc. (CAMI) to determine whether CAMI is liable for and can be compelled to pay license fees when musical compositions in the ASCAP repertory are performed at concerts sponsored by local community concert associations promoted by CAMI. In this test litigation CAMI concedes that on January 9, 1965 concert artists managed by it performed "Bess, You Is My Woman Now" publicly for profit at a concert sponsored by the Port Washington Community Concert Association without the permission of plaintiff Gershwin Publishing Company, the copyright proprietor, and that the performing artists and local association are, therefore, liable for infringement under the Copyright Act, 17 U.S.C. §§ 1(e), 101 (1964). CAMI takes the position that its participation in that infringing performance did not render it jointly and severally liable for copyright infringement. The district court granted summary judgment for the plaintiff upon its finding that CAMI had caused the copyright infringement by "organizing, supervising and controlling" the local organization and by "knowingly participating" in its infringement.[1] Gershwin Publishing Co. v. Columbia Artists Management, Inc., 312 F.Supp. 581 (S.D.N.Y.1970). We affirm.

The relevant facts and circumstances out of which the issue of law has arisen are the following.

CAMI engages in two business enterprises. One of them is acting as manager for concert artists, including booking them with professional impressarios. The other has to do with creating local organizations which produce the audiences for these artists in communities too small to support a commercial promoter. Its Community Concert Divi-

---

* Of the Southern District of New York, sitting by designation.

1. The district court awarded to the plaintiff statutory damages of $250 and nominal attorneys' fees of $125, and permanently enjoined any future violation of plaintiff's copyright. Gershwin Publishing Co. v. Columbia Artists Management, Inc., 312 F.Supp. 581, 583 (S.D.N.Y. 1970).

sion, which is responsible for CAMI's second enterprise, organizes, nurtures and maintains hundreds of local non-profit organizations, called "Community Concert Associations," which sponsor annual concert series at which CAMI-managed artists appear. [2]

The formation and operation of the unincorporated associations follow the same pattern throughout the country. After it is determined that community demand is sufficient to support at least three concerts each season, a CAMI field representative contacts local citizens and engineers the formation of an association. [3] As each concert season approaches, the field representative reviews with association officers a proposed budget, assists their tentative selection of artists, and helps to plan and carry through a one-week membership campaign [4] during which memberships entitling the purchaser to attend the concert series are sold to the public. With local officials he also compiles a report of the campaign's proceeds, and prepares the actual budget and the artists' contracts. CAMI's involvement with the Port Washington association followed this pattern in 1964.

CAMI is compensated for its "audience creation" in two ways. Artists performing at community concerts, whether managed by CAMI or not, pay a "differential," which may amount to as much as twenty-five per cent of their gross fee, for services rendered by CAMI in the formation and direction of local associations. In addition artists managed by CAMI pay it a management charge of fifteen per cent of the artist's fee after deducting the "differential." [5] CAMI therefore makes money through the reimbursement of its expenses, plus a percentage for profit for the nurturing of local associations; and artists who perform before the association's audiences pay a commission to CAMI for management.

Once an artist's community concert season has been so arranged, CAMI's "program girl" contacts him and obtains the titles of the musical compositions to be performed that season. CAMI then commissions the printing of concert programs, with its name prominently displayed on the cover, and sells them to the local associations on the artist's tour. CAMI stipulated that it deliberately made no effort to obtain copyright clearance for musical compositions included in the programs and performed at community concerts. Such clearance was, in its view, unnecessary because it claims no responsibility for any infringement which might occur.

Section 1(e) of the Copyright Act bestows upon the copyright proprietor "the exclusive right * * * to perform the copyrighted work publicly for profit," an interest which is protected by § 101 of the Act which holds accountable "any person [who] shall infringe the copyright." Although the Act does not specifically delineate what kind or degree of participation in an infringement is actionable,[6] it has long been held that one may be liable for copyright infringement even though he has not himself performed the protected

2. CAMI books approximately 3,000 community concerts each year.

3. Materials distributed by the field representatives include charts depicting the structure of the local association, a proposed constitution, model by-laws and a manual of instructions for association officers.

4. A "publicity kit" furnished to local organizations at cost included such promotional materials as press releases, scripts for radio interviews with prominent local citizens and a draft of a suitable proclamation for use by the mayor.

5. Presumably because its artists perform before larger audiences, CAMI charges associations with large memberships more for the same artist than it charges those with small memberships.

6. See Nutt v. National Institute Inc., 31 F.2d 236, 237 (2 Cir. 1929); Ball, The Law of Copyright and Literary Property § 149 (1944); Nimmer, Copyright § 141–42 (1969).

composition.[7] For example, a person who has promoted or induced the infringing acts of the performer has been held jointly and severally liable as a "vicarious" infringer, even though he has no actual knowledge that copyright monopoly is being impaired. Shapiro, Bernstein & Co. v. H. L. Green Co., 316 F.2d 304 (2 Cir. 1963); Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co., 36 F.2d 354 (7 Cir. 1929); see Study No. 25, Latman & Tager, "Liability of Innocent Infringers of Copyrights," prepared for the Subcomm. on Patents, Trademarks and Copyrights of the Senate Comm. on the Judiciary, 86th Cong., 1st Sess. 145–46 (1958). Although vicarious liability was initially predicated upon the agency doctrine of *respondeat superior*, see, e. g., M. Witmark & Sons v. Calloway, 22 F.2d 412, 414 (E.D. Tenn. 1927), this court recently held that even in the absence of an employer-employee relationship one may be vicariously liable if he has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities. Shapiro, Bernstein & Co., Inc. v. H. L. Green Co., *supra*; Comment, 64 Mich.L.Rev. 1172, 1175–78 (1966). There the defendant department store (Green) was held accountable for the infringing sale of pirated records manufactured and sold by its retailing concessionaire (Jalen). Under the terms of the concession agreement Green retained the ultimate right of supervision over the conduct of Jalen and received as rental a percentage of the concessionaire's gross sales. This court attached no special significance to the technical classification of the Green-Jalen relationship. Rather it found the policies of the copyright law would be best effectuated if Green were held liable, even in the absence of actual knowledge that the copyright monopoly was being impaired, for its failure to police the conduct of the primary infringer.

■ Similarly, one who, with knowledge of the infringing activity, induces, causes or materially contributes [8] to the infringing conduct of another, may be held liable as a "contributory" infringer. For example, in Screen Gems-Columbia Music, Inc. v. Mark Fi Records, Inc., 256 F.Supp. 399 (S.D.N.Y.1966), the district court held that an advertising agency which placed non-infringing advertisements for the sale of infringing records, a radio station which broadcast such advertisements and a packaging agent which shipped the infringing records could each be held liable as a "contributory" infringer if it were shown to have had knowledge, or reason to know, of the infringing nature of the records. Their potential liability was predicated upon "the common law doctrine that one who knowingly participates or furthers a tortious act is jointly and severally liable with the prime tortfeasor. * * *" 256 F.Supp. at 403.

■ The district court properly held CAMI liable as a "vicarious" and a "contributory" infringer. With knowl-

---

7. This principle was first enunciated in Gross v. Van Dyk Gravure Co., 230 F. 412 (2 Cir. 1916), in which the maker, printer and seller of an infringing photograph were held jointly liable for the complainant's damages. The court said: "Why all who unite in an infringement are not, under the statute, liable for damages sustained by plaintiff, we are unable to see * * * [A]s all united in infringing, all are responsible for the damages resulting from the infringement." *Id.* at 414; see Universal Pictures Co. v. Harold Lloyd Corp., 162 F.2d 354, 365–366 (9 Cir. 1947); Select Theatres Corp. v. Ronzoni Macaroni Co., 59 U.S.P.Q. 288, 291 (S.D.N.Y.1943); Howell, Copyright Law 179 (Latman ed. 1962); Nimmer, Copyright § 134 (1969).

8. See Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390, 396–397, 88 S.Ct. 2084, 2088, 20 L.Ed.2d 1176 (1968), in which the Court explained that "mere quantitative contribution cannot be the proper test to determine copyright liability * * * Rather, resolution of the issue * * * depends upon a determination of the function that [the alleged infringer] plays in the total [reproduction] process. * * *"

edge that its artists included copyrighted compositions in their performances, CAMI created the Port Washington audience as a market for those artists. CAMI's pervasive participation in the formation and direction of this association and its programming of compositions presented amply support the district court's finding that it "caused this copyright infringement." 312 F.Supp. at 583. Although CAMI had no formal power to control either the local association or the artists for whom it served as agent, it is clear that the local association depended upon CAMI for direction in matters such as this, that CAMI was in a position to police the infringing conduct of its artists, and that it derived substantial financial benefit from the actions of the primary infringers. CAMI knew that copyrighted works were being performed at the Port Washington concert and that neither the local association nor the performing artists would secure a copyright license. It was, therefore, responsible for, and vicariously liable as the result of, the infringement by those primary infringers.

Affirmed.