**F. E. L. PUBLICATIONS, LTD.,**
**Plaintiff,**

v.

**NATIONAL CONFERENCE OF CATHOLIC BISHOPS and United States Catholic Conference, Incorporated, Defendants.**

**No. 77 C 4326.**

United States District Court,
N. D. Illinois, E. D.

Oct. 5, 1978.

Laff, Whitesel & Rockman, Chicago, Ill., for plaintiff.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., Patrick F. Geary, Washington, D. C., for defendants.

## MEMORANDUM OPINION

ROSZKOWSKI, District Judge.

This is an action for copyright infringement and unfair competition. Counts 1–15 are brought under 17 U.S.C. § 101 and § 112. Jurisdiction is invoked under 28 U.S.C. § 1338 and § 1400. Count 16 is brought under 28 U.S.C. § 1338, alleging violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Count 17 alleges violation of *Ill.Rev.Stat.* (1973), Ch. 121½, §§ 311–318 and Ch. 121½, § 262. Count 18 alleges violations of Illinois common law.

The matter is before the court on plaintiff's motion for a preliminary injunction and defendants' motion to dismiss. For the reasons set forth below, both motions must be denied.

Plaintiff, F.E.L. Publications, Ltd. ("FEL") is engaged in the publication of religious music and the sale of songbooks, records and tapes of its music to churches, schools, and other religious organizations throughout the United States. FEL holds copyrights to the hymnals, guitar and choir booklets which contain this music.[1] In addition to selling its publications, FEL grants churches and institutions licenses, permitting them to copy any of plaintiff's songs for a fee. The songs and hymns are frequently used during church services.

The defendants, National Conference of Catholic Bishops ("NCCB") and United States Catholic Conference, Inc. ("USCC") are national organizations whose goals are to provide national coordination and assistance to the dioceses and archdioceses making up the Roman Catholic Church in the United States. NCCB is an unincorporated association located in Washington, D.C. comprised of all the bishops in the United States. It is one of a worldwide network of Episcopal Conferences set up by the Second Vatican Council. As established by the Councils' Decree on the Pastoral Office of the Church, the conference is a body in which the bishops of a given nation or territory jointly exercise their pastoral religious responsibility to promote the good of the church, nationwide.[2] The USCC is a civil

---

1. Exhibits 33–47, attached to the affidavit of Dennis Fitzpatrick, President of FEL, are copies of copyright registrations owned by FEL for the materials allegedly infringed by defendants.

2. "The National Conference of Catholic Bishops is an assembly of the Hierach of the United States and its territories. The purpose of the Conference is to foster the collegial concern of these bishops for the Church and society both

corporation, incorporated under the non-profit statutes of the District of Columbia, and is set up as a national level action agency of the Catholic Church.[3]

The NCCB is the parent body of the USCC. NCCB-initiated programs are frequently carried out by the USCC. Certain responsibilities are designated to the NCCB by the Vatican and are not designated to the USCC.[4]

Among the NCCB's responsibilities, as set forth by the Second Vatican Ecumenical Council, is the publication and supervision of liturgical books for its respective territory. The extent of the responsibility is to be determined by church discipline and law. (Newsletter, Bishops Committee on the Liturgy, May-June, 1975). The Bishops' Committee on the Liturgy ("Committee") has

the responsibility of regulating pastoral-liturgical action under the NCCB.[5]

The Committee has issued guidelines for publication of liturgical materials.[6] In these guidelines it distinguishes between official liturgical books[7] and non-official liturgical materials. In the case of official liturgical texts, the Committee communicates with music publishers and reviews their publications to determine suitability and accuracy. The Committee has the authority to issue a formal permission to publish official liturgical books, although such permission is usually obtained from the local ordinary. (Committee Newsletter, May-June, 1975).

With regard to the publication of non-official liturgical books,[8] the Committee does not grant a license to publish, (it is obtained from the local ecclesiastical authority), but

in the United States and throughout the world." Statutes of NCCB, Article I.

3. USCC is a program and service agency sponsored and directed by the bishops. The stated purpose of the USCC is:
   To unify, coordinate, encourage, promote and carry on all Catholic activities in the United States; to organize and conduct religious, charitable and social welfare work at home and abroad; to aid in education; to care for immigrants and generally to enter into and promote by education, publication and direction the objects of its being. USCC By-laws, Article II.
   In this context, bishops join with religious and lay persons on an interdiocesan and national basis where voluntary collective action is needed. (McManus Dep., Ex. 1).

4. The interrelationship of the NCCB and the USCC is set forth in the Statement of Goals of the USCC, approved at a NCCB/USCC general meeting, November 1970:
   In many cases, the NCCB has itself been responsible for the initiation of a given program with the USCC. The NCCB, however, does not normally operate such programs in a direct fashion. The only regular exception to this practice is with regard to those programs falling within the strict ecclesiastical responsibilities of the bishops themselves. The final determination of whether a particular function belongs within one conference or the other rests with the bishops. . . .

   The USCC, a separate organization which serves as the executive arm of the NCCB, exists as a national Catholic service agency of the United States Bishops. It does not

participate in any way in this limited legislative responsibility assigned to the NCCB for the Church in this country.

5. "This includes the supervision of the publication of the official liturgical books, as well as guidance in the issuance of popular liturgical materials." (Committee Newsletter, May-June, 1975).

6. The purpose of this national episcopal responsibility and of the present guidelines is not only to assert authoritative control but to encourage and collaborate in, the production and publication of the most effective and excellent liturgical books and other materials. . . . The statement of principals and regulations in these guidelines apply to all kinds of liturgical publications issued or distributed in the dioceses of the United States. . . . (Committee Newsletter).

7. The Committee guidelines define official liturgical books as all books or excerpts from books which are intended for use by the celebrant or ministers in the celebration of the Mass, sacraments or other liturgical rites.

8. The Committee designates two categories of non-official liturgical materials: (1) semi-official liturgical publications which are editions containing the contents of the official texts but not intended for use during celebrations or as "participation aids", but are generally used as study aids; (2) Participation materials which are used during liturgical celebration but are not official liturgical books. (Committee Newsletter, May-June 1975).

reviews the publisher's manuscript or page proofs for errors in text or rites and for suitability. The Committee may provide suggested formats for participation aids, but the guidelines emphasize a preference for a variety of options and the selection of the materials by the publishers. (Committee Newsletter, May-June 1975).

In the case of participation materials, the guidelines of the Committee contain reminders to the publishers of the need for copyright permissions.[9]

The history of this action begins in 1976, when FEL filed a suit against the Catholic Bishop of Chicago, a corporation solely representing the institutions comprising the archdiocese of Chicago and certain parishes, alleging violations of the Copyright Act. Plaintiff alleged that the defendants were infringing its copyrights by the unauthorized duplication and use of its songs in song collections prepared at the parish level for use during church celebration, the so-called "homemade or pirated" hymnals. As a result of an agreement between the parties, over 80,000 "homemade" hymnals and song collections containing the allegedly infringing materials were collected from parishes in Chicago and impounded by the Court. Thereafter, FEL undertook an investigation of other large dioceses and archdioceses in the United States to determine if unauthorized copying was occurring in other parishes. FEL alleges that it found copyright violations nationwide and notified the bishop in each area that the parishes were violating the copyright laws by reproducing FEL's copyrighted music without permission for use in the "pirated" songbooks. FEL requested assistance in determining the extent of the problem and compensation for damages. According to plaintiff no ameliorative action was taken by the individual bishops. Plaintiff then filed this suit against NCCB and USCC.

The complaint alleges that unauthorized copies of songs from FEL's copyrighted hymnals and other publications are being produced and used in various archdioceses and dioceses of the United States [10] in violation of the copyright laws.[11] Plaintiff further alleges that the NCCB and the USCC infringed FEL's copyrights by:

> Failing to provide adequate direction to the dioceses and parishes concerning the proper use of plaintiff's copyrighted materials and thereby caused, permitted and materially contributed to the publication, distribution and/or sale in many of the archdioceses and dioceses . . . of songbooks including songs which were copies largely from plaintiff's aforementioned copyrighted work.

The complaint seeks a preliminary and permanent injunction against defendants and all dioceses, archdioceses and other institutions within their supervision and control restraining the allegedly illegal acts; an order that all infringing copies be destroyed; compensatory and punitive damages.

FEL has moved for a preliminary injunction to enjoin defendants from further use, publication or dissemination of the hymnals containing unauthorized copies of plaintiff's copyrighted works and to impound the "pirated" hymnals, nationwide.

Defendants have filed a motion to dismiss Counts 1–16 for failure to state a claim, Rule 12(b)(6), Fed.R.Civ.P.; and to dismiss Counts 17 and 18 for lack of federal jurisdiction, Rule 12(b)(2), Fed.R.Civ.P.

### COUNTS 1–15

██ A preliminary injunction is an extraordinary remedy. The decision to grant or deny a preliminary injunction "depends upon a balancing of several factors, includ-

---

9. "Publishers are reminded of the need of copyright permission for the publication of participation aids. This refers not only to the English translations of the various texts, but also to all musical compositions and settings." (Committee Newsletter, May-June 1975).

10. The complaint names Chicago, Boston, Brooklyn, Buffalo, Cincinnati, Cleveland, Denver, Fort Wayne, South Bend, Green Bay, New York, Phoenix, Arlington (Va.), St. Augustine and San Francisco.

11. Copies of the alleged infringing songbooks are attached as exhibits to the complaint.

ing the likelihood of success on the merits, the lack of adequate remedy at law, the lack of irreparable harm if the injunction is not issued and a comparison of the relative hardships imposed on the parties." *Banks v. Trainor,* 525 F.2d 837, 841 (7th Cir. 1975).

■ Two elements are necessary to establish a *prima facie* case of copyright infringement: ownership of a valid copyright, and copying by the alleged infringer. *Bell v. Combined Registry,* 397 F.Supp. 1241 (N.D.Ill.1975), *aff'd.* 536 F.2d 164 (7th Cir. 1976); 2 *Nimmer on Copyright* § 141. Certificates of registration are *prima facie* evidence of ownership and validity of a copyright. *Flick-Reedy Corp. v. Hydroline Mfg.,* 351 F.2d 546 (7th Cir. 1965). Plaintiff has attached to its complaint registration certificates for the works allegedly infringed by defendants, and defendants have not challenged the validity of the copyrights. Therefore, we conclude plaintiff has established ownership.

Plaintiff must also establish unauthorized copying by the defendants. The complaint contains no factual allegations with regard to any acts of actual unauthorized copying by the defendants. Consequently, any finding of liability on the part of defendants must be based on some theory of vicarious liability.

■ One may be liable as a vicarious infringer, if a special relationship such as agency or partnership exists, or in the absence of such relationship, if the defendant has the right and ability to supervise the infringing activities as well as a direct financial interest in those activities. *Shapiro, Bernstein & Co. v. H. L. Green & Co.,* 316

F.2d 304 (2d Cir. 1963); *Gershwin Publishing Corporation v. Columbia Artists Management, Inc.,* 443 F.2d 1159 (2d Cir. 1971).

■ A person who promotes or induces the infringing acts of another is jointly and severally liable as a vicarious infringer even without knowledge of the infringement. *Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co.,* 36 F.2d 354 (7th Cir. 1929). And one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another may be liable as a "contributory" infringer. *Gershwin Publishing Corporation v. Columbia Artists Management, Inc., supra; Screen Gems-Columbia Music Inc. v. Mark Fi Records, Inc.,* 256 F.Supp. 399 (S.D. N.Y.1966).

Defendants contend that they have no authority over the dioceses, archdioceses and parishes and do not have the right or ability to supervise or control their activity with regard to the infringement acts involved here. Defendants claim that the residential bishop, the local ordinary, has sole authority for administration of the parishes under his direction. Further, defendants contend the NCCB is not a "higher authority" which a local ordinary must obey. While NCCB admits that under some instances an episcopal conference can establish ecclesiastical norms which bind the local ordinary, the conference has no power to enforce the norms if disregarded by individual bishops.[12]

NCCB concedes that it has organizational authority with regard to certain liturgical matters involving approval of official liturgical texts, but contends it only has adviso-

---

12. BINDING DECISIONS

Decisions of the Conference have juridically binding force only when common law so prescribes or when required by a special mandate of the Holy See given *motu proprio,* or in response to a petition from the Conference itself. All such decisions must be made lawfully and by a two-thirds vote of the members who have deliberative voice in the Conference nor do they have the force of law until they have been approved or confirmed by the Holy See. NCCB Statutes & Bylaws, Article 13.

NON–BINDING DECISIONS

Decisions of the Conference are normally devoid of juridical binding force. Nonetheless, when passed by a majority of those voting, they should as a rule be observed by all members as an expression. NCCB Statutes and Bylaws, Article 12.

. . . and, [A] decision reached by the general membership of the USCC should never be understood as possessing the canonical binding force which on occasion may characterize formal decisions reached by the bishops as members of the NCCB. USCC, Statement of Goals.

ry powers with regard to non-official liturgical texts and asserts the materials involved here, while admittedly used during the celebration of the liturgy are not "official texts" and not subject to NCCB approval. (Affidavit 2, Fredrick R. McManus ¶ 11).

Further, defendants contend that they have no organizational authority over the production of songbooks in the parishes.

Defendants raise the argument that the definition of liturgy, for purposes of NCCB authority, is a matter wholly within the authority of the Bishops of the Church. They contend that the First Amendment bars this court from substituting its judgment for that of the church with regard to what lines of authority exist between the parishes, the bishops and defendants, the nature of defendants' authority with respect to the liturgy and whether the songbooks involved here constitute "liturgy" within the responsibility of the NCCB.[13]

Plaintiff argues that by the NCCB Guidelines for the Publication of Liturgical Materials, defendants exert authority and ability to instruct those producing the alleged infringing materials on the need for following the copyright laws. Plaintiff further contends that the NCCB has the power to prevent the use of infringing materials by withholding its approval on works which violate its guidelines. This is too broad a statement of the NCCB's authority. In the NCCB guidelines it states that the NCCB has the authority to *supervise* the publication of official liturgical texts and to withhold approval of non-conforming texts, but may only exert *guidance* in the issuance of popular liturgical materials. Defendants have presented testimony that the Church's official liturgical texts, the only texts requiring NCCB approval, are identifiable and that the plaintiff's songs are not among the approved liturgical texts. (Affidavit 2, Fredrick R. McManus, ¶¶ 4, 11). Plaintiff has presented no testimony to the contrary, except its own view that these songs are "liturgy".

In addition, it appears that defendants' Statutes and Bylaws, as well as its interpretation of Canon Law, support their contention that they do not have authority to supervise or control the infringing activities nor would they have the ability to enforce copyright compliance.

Plaintiff argues that even if defendants lack express authority to supervise and control songbook publication in the parishes, they are liable for the infringing acts of those who normally would look to the NCCB for direction and guidance in the production of liturgical materials. In support of this position, plaintiff relies on *Gershwin v. Columbia Artists Management, Inc.*, 443 F.2d 1159 (2d Cir. 1971). In *Gershwin*, the defendant CAMI acted as manager for concert artists and created, organized and maintained local non-profit organizations which sponsored concerts where CAMI and non-CAMI artists performed. The artists did not obtain permission to perform copyrighted musical compositions before the concerts. The court found that CAMI was liable for the infringing performances as a vicarious and contributory infringer. Although CAMI had no formal power to control the content of the performances, the court found that it had been an active participant in organizing and supervising the local organizations that sponsored the concerts. CAMI representatives worked with the local organizations to prepare a budget, select artists and plan publicity. Concert programs prominently displayed CAMI's name on the cover. CAMI-managed artists paid CAMI a commission for services rendered in connection with each concert and non-CAMI artists paid a "differential". CAMI admitted that it knew the performers had not obtained copyright permission. Based on these facts the court concluded that the infringing parties depended upon CAMI for direction in the activities, that CAMI was in a position to police the infringing conduct and that it derived substantial financial benefit from the acts of the primary infringers. 443 F.2d at 1163.

13. This argument is discussed more fully with regard to defendants' motion to dismiss.

We see a distinction between the position of CAMI with regard to the primary infringers and the relationship of defendants and the alleged infringer here. In *Gershwin* the evidence showed that CAMI was involved in every aspect of the planning and production of the infringing performances. We find no comparable showing of direct involvement by defendants here in all aspects of the alleged infringing activities. Nor has plaintiff shown a direct and substantial financial benefit accruing to defendants. We are not persuaded by plaintiff's argument that the potential financial benefit to a parish because it does not pay licensing fees or purchase plaintiff's books is similar to the benefit of the commissions paid directly to CAMI by the infringing performers.

In *Roy Export Co. Establish. v. Trustees of Columbia University*, 344 F.Supp. 1350 (1972), the court denied plaintiff's request for a preliminary injunction against Columbia based on a vicarious infringement theory. In *Roy Export,* a campus student organization showed a bootleg copy of a copyrighted film on the campus of the Columbia University. The court found that the University had the ability to control its premises and equipment, but denied the motion because plaintiff failed to show any financial benefit to the University arising from the infringing activity. The court noted that financial benefit was an essential element of plaintiff's claim and without it, plaintiff had not even made a limited showing of probable success on the merits. *Id.* at 1353.

In light of the above, we think that plaintiff has not made the requisite showing of probable success on the merits of its claim against NCCB and USCC needed for the issuance of a preliminary injunction.

Plaintiff raises an additional basis for imposing liability on defendants. It contends that under agency law, defendants are liable for the infringing acts of unnamed parishioners. An unincorporated association is liable for the torts committed by its agents or servants in the course of their service or employment. 6 *Am.Jur.2d* § 47.

NCCB is admittedly an unincorporated association. The gist of plaintiff's argument is that the tort of a parishioner can be imputed to his or her pastor, from pastor to individual bishop, and from bishop to the NCCB, an unincorporated association of bishops. Such liability would require plaintiff to show that the NCCB has authority with regard to the infringing activity and that individual bishops act as agents for NCCB in this area. We find that plaintiff has not made this showing of agency relationship.

Plaintiff claims irreparable injury will result if an injunction is not issued. It cites the rule that when a *prima facie* case of copyright infringement has been made, plaintiff is entitled to a preliminary injunction without a detailed showing of danger of irreparable harm. *Rice v. American Program Bureau,* 446 F.2d 685 (2nd Cir. 1971). However, in our view, plaintiff has not made a *prima facie* showing against defendants and, therefore, that rule need not be applied.

Plaintiff claims that if the injunction is not granted the numbers of infringing materials will continue to multiply. This claim is too speculative on plaintiff's part to serve as a clear showing of irreparable harm. Plaintiff then makes a confusing argument. First, it contends that because copies are not generally sold, it will be difficult to assess money damages; then it contends that damages would not adequately compensate for its lost sales.

We believe that plaintiff could assess the damages resulting from lost profits since in its complaint plaintiff seeks both compensatory and punitive damages from defendants. In addition, an order of this court directing the NCCB and the USCC to restrain from infringing plaintiff's copyrights may be a futile act, have no effect on the infringing activity, and would not prevent injury to plaintiff. Defendants have presented substantial evidence in support of their claim that they lack authority to enforce such an order in the dioceses or parishes except through moral persuasion. The ineffectiveness of this moral persuasion

is evidenced by the fact that on prior occasions defendants have urged parishes to discontinue the unauthorized use of copyrighted materials,[14] but the practice has continued, unabated. Consequently, the motion for preliminary injunction must be denied.

■■ We now turn to defendants' motion to dismiss. In considering a motion to dismiss, the court must assume all well pleaded facts as true and any inferences reasonably drawn therefrom in the light most favorable to plaintiff. *O'Hare International Bank v. Hampton*, 437 F.2d 1173 (7th Cir. 1971). The courts have consistently held that a complaint should not be dismissed for failure to state a claim unless it appears that under no set of facts would a claimant be entitled to relief. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Viewing the complaint in light of the above standard, we conclude that Counts 1–15 set forth a claim for copyright infringement against defendants. It appears that the allegations of the complaint are sufficient to entitle plaintiff to relief if proven.

Defendants suggest that this case raises substantial First Amendment problems. It is their position that a determination of the lines of authority and supervision within the Church and its internal policies are exclusively within the authority of ecclesiastical law. They contend that certain of these matters may ultimately be outside the fact-finding authority of this court. We are mindful of the rule that a civil court is bound to accept the ecclesiastical decisions of the highest church judicatory on matters of discipline, faith, internal organization or ecclesiastical rule, custom or law. *Serbian Eastern Orthodox Diocese etc. v. Milivojevich*, 426 U.S. 696, 713, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). However, this rule has been applied most often in cases involving challenges to the ecclesiastical tribunal's resolutions of a religious or intra-church dispute. *See Watson v. Jones*, 13 Wall. 679, 80 U.S. 679, 20 L.Ed. 666 (1872); *Gonzalez v. Archbishop*, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929).

This case does not involve an intra-church dispute or a challenge to an ecclesiastical tribunal's decision. Rather the issue before this court is whether defendants have exercised or have the ability to exercise supervision and control over the activities of the alleged infringers sufficient to support a finding of vicarious infringement under the copyright laws. It does not appear at this time that it would be impossible for plaintiff to prove its case without impermissible forays into ecclesiastical law. Conceivably, plaintiff could establish, as in *Gershwin,* a pattern of activity which, even in the absence of formal and express authority, reflects an ability to control the infringing activities.

Defendants argue that the affidavits of Fredrick R. McManus must be accepted as "the definitive authority" with regard to the relationships in issue here and with respect to the definition of "liturgy". In *Serbian Eastern Orthodox*, the Court noted that canon law by which disputing parties are bound is subject to interpretations which are not always consistent. Plaintiff should be allowed to refute defendants' interpretations if it can.

### COUNTS 16–18

■ With regard to Counts 16, 17 and 18, plaintiff's claims are based on a theory of vicarious liability. As stated above, we have serious reservations about plaintiff's ability to succeed on the merits of its claim against the NCCB and the USCC. Therefore, plaintiff's request for injunctive relief under these counts must be denied.

Defendants have moved to dismiss these counts under Rule 12(b)(6), Fed.R.Civ.P.

### LANHAM ACT CLAIM

■■ Defendants contend that Count 16, alleging unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C.

---

14. Bishop's Committee on the Liturgy Newsletter, December 1967, May 1969, in which the NCCB appealed "to those engaged in parish music programs . . . to curb and discourage the increasing abuse [of copyrights]."

**1044**

§ 1125(a) fails to state a claim against the NCCB and the USCC and should be dismissed. Section 43(a) is broadly worded and creates a new, statutory federal tort apart from common law unfair competition. *Federal-Mogul-Bower Bearings, Inc. v. Azoff*, 313 F.2d 405 (6th Cir. 1963). It is not limited to suits between business competitors, *Mortellito v. Nina of California*, 335 F.Supp. 1288 (S.D.N.Y.1972), nor does it require ownership of a registered trademark. *Boston Professional Hockey Assoc. Inc. v. Dallas Cap and Emblem Mfg. Co.*, 510 F.2d 1004 (5th Cir. 1975), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). Defendants' contention that to meet interstate requirements of the Act, plaintiff must allege the hymnals were distributed or sold in interstate commerce, is a too limited reading of the Act. Acts in violation of 43(a) which are apparently local in nature are subject to the Act "if they have a substantial effect on interstate commerce." *Golden Door, Inc. v. Odisho*, 437 F.Supp. 956 (N.D.Cal.1977); *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117 (9th Cir. 1968). Plaintiff has alleged that its business is interstate and therefore even local activities which diminish plaintiff's business or damage plaintiff's reputation could affect interstate commerce. When the sale of a defendant's product, even if intrastate, could affect the interstate sale and reputation of plaintiff's property, it meets the "commerce" requirement of Section 43(a). *Maier Brewing, supra.*

Section 43(a) provides in relevant part:
(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, . . . a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, . . . shall be liable . . . [to] any person who believes that he is or is likely to be damaged by the use of any such false description or representation. 15 U.S.C. § 1125(a).

Defendants argue that they cannot be liable for violations of the Act since there are no allegations that either the NCCB or the USCC actually produced the infringing hymnals. This contention overlooks the fact that the Lanham Act and the law of unfair competition impose vicarious liability on those who induce or are responsible for those who perform the violative acts. *Scotch Whiskey Assoc. v. Boston Distilling Co.*, 489 F.2d 809 (7th Cir. 1973).

■■■ Trademark infringement under the Lanham Act is found when evidence indicates a likelihood of confusion, deception or mistake on the part of the consuming public. *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir. 1976). The same standard applies under 43(a) even though a plaintiff does not have a registered trademark. *Boston Professional Hockey Assoc. Inc. v. Dallas Cap and Emblem Mfg. Co., supra.* Likelihood of confusion is a question of fact. *Union Carbide v. Ever-Ready*, 531 F.2d 366, 383 (7th Cir. 1976), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94. The state of mind of the public must be the basis for the court's determinations but the plaintiff is not required to prove the likelihood of confusion at the pleading stage. *McDonald's Corporation v. Gunvill*, 441 F.Supp. 71, 73 (1977). Plaintiff alleges it has become well known throughout the country as the publisher of religious songs, hymns and books. Plaintiff contends the trade and public is misled into believing that the alleged infringing hymnals are authorized by plaintiff or created for the persons distributing the hymnals, creating a false designation of origin. Causes of action under Section 43(a) generally involve misuse of a plaintiff's trademark, *Bernard Food Industries, Inc. v. Dietene Company*, 415 F.2d 1279 (7th Cir. 1969), or false advertising, providing the misrepresentation relates to the defendant's own product. *Alberto-Culver Co. v. Gillette Co.*, 408 F.Supp. 1160, 1163 (N.D.Ill. 1976).[15] The facts presented here involve a

**15.** It is clear . . . that the primary purpose of the Act was to eliminate deceitful practices in interstate commerce involving the misuse of trademarks, but along with this it sought

somewhat novel application of the Act. Plaintiff alleges that defendants have misappropriated plaintiff's copyrighted songs and hymns, which, in effect, constitute its product and by unauthorized copying and distribution or sale under the name of an individual parish and without acknowledgement of FEL's ownership rights have created a false impression of the source of the songs in those members of the public who use the books.

In essence, the complaint alleges sale or distribution of a product to the consuming public with a false designation of origin. Since the ultimate test of plaintiff's claim is whether there is likelihood of confusion by the consuming public, a question of fact which cannot be decided on a motion to dismiss, we conclude plaintiff has stated a claim for relief under the statute.

## STATE CLAIMS

■ Defendants contend that this court has no jurisdiction over Counts 17 and 18. We find jurisdiction under 28 U.S.C. § 1338(b), which states:

"The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright . . . laws."

Count 18, grounded in common law and Count 17, based on the Illinois statute governing deceptive trade practices, can be treated together since Illinois Revised Statutes, Ch. 121½, § 311 et seq. is merely a codification of the Illinois common law of unfair competition. *National Football League Properties, Inc. v. Consumer Enterprises, Inc.*, 26 Ill.App.3d 814, 327 N.E.2d 242 (1975). Plaintiff has claimed that some of the alleged violations occurred in Illinois. Therefore, we can consider the applicability of the law to those claims. The sufficiency of these counts are measured by the same test. "Unfair competition is a broader concept than trademark infringement, and depends upon likelihood of confusion as to the

source of plaintiff's and defendant's goods when the whole appearance of the product is considered." *National Football League, supra* at 247.

The *Illinois Deceptive Trade Practices Act*, Ill.Rev.Stat., Ch. 121½ § 261 et seq. is designed to protect "consumers and borrowers and businessmen against fraud, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Preamble to Ill. Rev.Stat., Ch. 121½ § 261 et seq. It applies to conduct which creates a likelihood of confusion as to source, sponsorship or approval. Section 261 provides in relevant part:

"A person engages in a deceptive trade practice when . . . he

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services . . .

.    .    .    .    .

(5) represents that goods or services have sponsorship, approval . . . that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have."

Plaintiff again alleges that "pirated" hymnals are published, distributed and/or sold without permission of plaintiff, or acknowledgement of the source of the songs or hymns contained within, creating, by implication, a belief that FEL authorizes or sponsors the hymnals. Whether such activity causes the likelihood of confusion or misunderstanding of source required by the act is a factual determination, unresolvable on a motion to dismiss. Viewing the allegations of the complaint, we conclude they are sufficient to state a claim for relief.

■ Defendants raise two further arguments. First, they contend that no liability exists as to the NCCB or the USCC since they are not alleged to have produced the hymnals. However, they may be found vicariously liable for the acts of others under

to eliminate other forms of misrepresentations which are of the same general character even though they do not involve any use of what can

technically be called a trademark. . . . *Federal-Mogul-Bower Bearings, Inc. v. Azoff, supra* at 409.

the standards set forth above. Therefore, we reject this ground for dismissal. The second argument for dismissal involves Count 18. Defendants contend state law is preempted by federal copyright law. In support of this position they cite the doctrine established by the Supreme Court in *Sears, Roebuck and Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and *Compco Corp. v. Day Brite Lighting Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). In those cases the articles involved had been denied federal patent protection. The Court held under the Supremacy Clause that state unfair competition laws could not preclude copying articles which lacked the qualities required for a federal patent. 376 U.S. at 230, 231, 84 S.Ct. 784.

 Clearly the situation presented here is different than the *Sears-Compco* facts. Plaintiff's works are protected by federal copyright law. Therefore, an attempt to protect those works under state law would not interfere with the objectives of federal law in any way. In determining whether state law is preempted under the Supremacy Clause, the:

> "primary function is to determine whether, under the circumstances of this particular case, [the state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

We see no conflict between enforcement of federal and state law here. In addition, Count 18 alleges damages to FEL's licensing program because users of the infringing hymnals will assume FEL's authorization and not seek permission for use under plaintiff's license. The preemption doctrine will not be applied in a situation where the alleged infringing activity is not within the scope of the federal law. *See Goldstein v. California*, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973). The copyright laws do not protect a licensing program instituted by a copyright owner. Therefore, defendants' preemption argument is inappropriate.

In conclusion, we find that plaintiff has stated a claim for relief under Counts 16, 17 and 18.

## CONCLUSION

Accordingly, plaintiff's motion for a preliminary injunction is denied for the reasons set forth above. Defendants' motion to dismiss is denied.