NIKE, INC., Plaintiff,

v.

RUBBER MANUFACTURERS ASSOCI-
ATION, INC., et al., Defendants.

No. 80 Civ. 4990.

United States District Court,
S. D. New York.

Feb. 27, 1981.

**920**

Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., George K. Meier, III, Portland, Or., Jay Greenfield, Jonathan Sinnreich, Elizabeth S. Koltun, Peter Jarvis, New York City, of counsel; Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiff Nike, Inc.

Kirkwood, Kaplan, Russin & Vecchi, New York City, Kaplan, Russin & Vecchi, Washington, D. C., Julius Kaplan, Washington, D. C., Kathleen F. Patterson, Foley, Lardner, Hollabaugh & Jacobs, Washington, D. C., Douglas V. Rigler, Washington, D. C., of counsel, for defendant and counterclaim plaintiff Brooks Shoe Manufacturing Co., Inc.

## OPINION

BONSAL, District Judge.

Defendant Brooks Shoe Manufacturing Co., Inc. ("Brooks"), one of the defendants and the counterclaim plaintiff herein, moves for a preliminary injunction against plaintiff and counterclaim defendant Nike, Inc. ("Nike") pending the final hearing and determination of the counterclaim. The injunction would enjoin Nike from (a) authorizing, permitting, approving or in any manner causing Nike's "swoosh-stripe" trademark symbol or the "Nike" name to be placed or affixed on athletic shoes (including baseball and football shoes) manufactured or distributed by shoe manufacturers other than Nike; and (b) authorizing, permitting, approving or in any manner causing any professional athlete to wear athletic shoes made or distributed by shoe manufacturers other than Nike which bear in any manner the Nike "swoosh-stripe" trademark or "Nike" name.

A hearing was held on the counterclaim on December 18, 19 and 22, 1980. The parties have filed briefs and, at the request of the Court, have submitted findings of fact and conclusions of law.

Brooks alleges that its counterclaim is based upon Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Section 1337 of the Judicial Code, 28 U.S.C. § 1337. Brooks charges Nike and its wholly-owned subsidiary, BRS, Inc. ("BRS"), with violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, and asks for treble damages and costs, including reasonable attorneys' fees. Brooks also claims that the placing of the Nike trademark on shoes made by Brooks and other manufacturers constitutes false designation of origin and false description, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

Brooks alleges in its counterclaim that in recent years Nike has experienced rapid growth in sales of running shoes; during its fiscal year ending May 31, 1977 Nike sales were approximately $29 million; during fiscal year 1978, $71 million; and during fiscal year 1979, $150 million. Brooks estimates

Nike's sales for its fiscal year 1980 will increase to $270 million. Brooks also alleges that Nike's share of the running shoe market has increased from 28% in 1977 to over 51% in 1980, and that it dominates the market.

The prospectus dated December 2, 1980 by which Nike offered 2,377,000 shares of its Class B common stock to the public states:

"The Company believes that it is the largest supplier of high quality athletic shoes in the United States and the third largest in the world. Although the Company is unaware of any comprehensive independent trade statistics, it believes, based on its knowledge of the market and available trade information, that its running, basketball and tennis shoes have the highest sales volume in the United States."

In its counterclaim, Brooks alleges 12 ways in which it claims that Nike has been attempting to monopolize the running shoe market in violation of Section 2 of the Sherman Act.

As part of its marketing of cleated sports shoes, which it began in 1980, Nike pays professional athletes prominent in their sport to wear its shoes, all of which bear a distinctive trademark characterized as a "swoosh-stripe." In some cases, Nike enters into oral contracts with athletes; thus, in January 1980, Nike agreed to make payments to 43 of the players in the 1980 Super Bowl who agreed to wear Nike shoes during the game. Nike also enters into written endorsement contracts with athletes, which require an athlete to wear Nike shoes exclusively. During the 1980 baseball and football season, Nike entered into such contracts with 72 major league baseball players and 115 football players. Brooks also enters into endorsement contracts with professional athletes.

The practice which is the subject of Brooks' application for a preliminary injunction is the "doctoring" of shoes worn by prominent professional football and baseball players to show the Nike trademark even though they were manufactured by Brooks or other manufacturers. The settings of the doctoring include Super Bowl XIV in January 1980 and the baseball season of 1980.

Dennis Harrah and Larry Brown, football players in the 1980 Super Bowl, concededly engaged in doctoring activity, of which Nike subsequently became aware, during the game. Both players wore shoes not of Nike manufacture to which the Nike trademark symbol had been affixed. Harrah's shoes were doctored both with the Nike trademark and that of another shoe manufacturer, Pony. The doctored shoes were not Brooks shoes, and when Nike learned of the doctoring, it withheld further payments to both players.

Baseball players who concededly wore shoes of other manufacturers doctored with the Nike logo were Mike Schmidt, voted the most valuable player in the major leagues, Bob Boone, and Del Unser, all of the Philadelphia Phillies.

### Schmidt

Schmidt admitted to wearing shoes doctored with the Nike trademark during part of the baseball season. He was under contract to Nike to wear Nike shoes, for which he received payments with provisions for bonuses. Schmidt's contract provided that he would not wear shoes not manufactured by Nike and that he would not doctor shoes of other manufacturers to show the Nike trademark. In an affidavit, Schmidt stated that when playing on artificial surfaces he found that his Nike shoes caused him discomfort and problems, so that he used shoes manufactured by Brooks and Mizuno, which gave him greater comfort, and doctored them with the Nike trademark. He stated that a Brooks sales representative provided him with the Brooks shoes which he used and that the representative did not object to the doctoring.

Nike personnel first learned of Schmidt's doctoring activity in June, 1980. At the hearing, Russell Morrison, the former director of cleated sports promotions at Nike, testified that while in the locker room of the Philadelphia Phillies last June, he ob-

served in Schmidt's locker shoes doctored with a painted "swoosh-stripe." Accompanying Morrison were two other Nike employees, Don Cantin and Charles Denson. Morrison testified that he, Denson and Cantin commented to Schmidt that he had done an "admirable job of doctoring." Morrison also testified that Cantin communicated information of Schmidt's doctoring activity by telephone, in his presence, to Ladd Lonnquist, Nike's Director of Operations.

Morrison stated that he did not instruct Schmidt to stop wearing the doctored shoes, nor, to his knowledge, did any other Nike employee. Nike continued to make payments to Schmidt under the endorsement contract after this occurrence.

Later in the season, Nike provided Schmidt with another model, "the Brooklyn," which he tried out on artificial surfaces and found to be satisfactory. Thereafter, he wore Nike shoes exclusively. His explanation for the doctoring was that he was under contract with Nike and that he felt it was only fair to display the Nike trademark. Schmidt stated that when Nike's representative discovered the doctoring, he informed Schmidt that Nike would work to get him a suitable shoe for artificial surfaces, which subsequently happened.

### Boone

In August 1980, Bob Boone, also a member of the Philadelphia Phillies, had a shoemaker place a Nike trademark on a pair of Mizuno shoes. There is no evidence that Nike knew about this or that it was consulted by Boone. Boone wore the doctored shoes in about ten games, allegedly under muddy conditions. In September, Boone arranged to have a pair of Brooks shoes doctored with a Nike trademark, but there is no evidence that he wore them in a game.

### Unser

The evidence shows that Del Unser, another Phillie, doctored a pair of Adidas shoes with the Nike trademark. He wore these shoes in batting practice. When Nike learned of the doctored shoes around August 1, they provided Unser with a "Brooklyn" model of Nike shoes. Thereafter, Unser used the Nike shoes at batting practice. There was evidence that Unser had two other pairs of shoes doctored with the Nike trademark, but these he later removed.

### Moseley

In addition to its endorsement contracts with baseball players, Nike entered into similar contracts with 115 professional football players during the 1980 football season, one of whom was Mark Moseley, a place kicker for the Washington Redskins. There is evidence that during the 1980 season Moseley doctored a Spot Bilt shoe with the Nike trademark, which he wore in a game. At the time, his other shoe was a genuine Nike shoe. Although the doctoring was discovered by both Nike and Brooks in July, 1980, this incident was not protested by any of the parties until October when Brooks applied for a temporary restraining order.

Although Brooks suggests that the foregoing instances of doctored shoes were merely the tip of the iceberg, it has produced no evidence of other incidents. However, these instances doubtless arose as a result of the keen competition existing between the various shoe manufacturers and because the players who were paid by a manufacturer to wear a particular shoe thought their shoes should carry the trademark of that manufacturer.

Evidence at the hearing indicates that the doctored shoes were used in sporting events which received publicity and television coverage.

. . . . .

The obtaining of injunctive relief in this circuit "clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H. P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir. 1979). Brooks must therefore establish both irreparable harm and the likelihood of prevailing

on its claims under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[1] and the New York common law of misappropriation. If Brooks is unable to demonstrate the likelihood of success on the merits, the Court may nonetheless grant injunctive relief if it finds that the balance of hardships tips decidedly in Brooks' favor.

Nike contends that the legal merit of Brooks' claims need not be reached by the Court, since Nike is not liable for the doctoring of shoes by the players without its consent or participation. Nike argues that the players who endorse its products are consultants and independent contractors. An examination of Schmidt's endorsement contract indicates that this argument is not accurate. Paragraph 4 provides:

"A.  If requested to do so by BRS, consultant agrees to make himself available twice in the contract term for photographs for use in BRS' advertising.

B.  If requested to do so by BRS, consultant shall make one public appearance in the Contract Term for the purpose of endorsing NIKE athletic shoes."

It thus appears that the players agreed to be a significant part of Nike's advertising program when requested.

Nike contends that it has not violated the provisions of the Lanham Act because the doctoring was done without its participation, knowledge or approval. The record indicates, however, that Nike knew of Schmidt's doctoring activity, since three of its employees observed Schmidt's doctored shoes. None of them informed Schmidt that this was a breach of his agreement. Indeed, their apparent acquiescence would indicate tacit approval.

Moreover, Nike's restrictive reading of Section 43(a) is not persuasive. In *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479 (S.D.N.Y. 1968), the court granted injunctive relief against those who knowingly played a significant role in the deception involved. Stix, one of the parties enjoined, argued that it was unable to police the conduct of its retailers who distributed an infringing product. The court disagreed and noted:

"[T]he distribution of the mats and other promotional advertising material was part of Stix's campaign to sterilize United's mark. And entirely apart from this calculated purpose, it was foreseeable that retailers would use the material in an infringing manner, as so many did." *Stix, supra*, at 495–96.

*See John Wright, Inc. v. Casper Corp.*, 419 F.Supp. 292 (E.D.Pa.1976), *aff'd in part, rev'd in part sub nom. Donsco, Inc. v. Casper Corp.*, 587 F.2d 602 (3d Cir. 1978), in which the defendant, after purchasing one of the plaintiff's reproductions of an antique toy bank, had it copied by a contract manufacturer. Advertisements and catalogs prepared by a mail-order gift house erroneously attributed sponsorship of the defendant's product to the plaintiff's sponsor. The court noted that this "false designation of origin" was technically a violation of Section 43(a) for which the defendant was responsible. *See also Parkway Baking Co. v. Freihofer Baking Co.*, 225 F.2d 641 (3d Cir. 1958); *Scotch Whisky Ass'n v. Barton Distilling Co.*, 489 F.2d 809 (7th Cir. 1973); *F. E. L. Publications v. National Conference of Catholic Bishops*, 466 F.Supp. 1034, 1044 (N.D.Ill.1978).

■ At the hearing, vice-president Robert Woodell testified that Nike's corporate

---

1. Section 43(a) provides:

"Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols *tending falsely to describe or represent the same*, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

policy has been to oppose doctoring, and that this policy is reflected in language prohibiting such acts in the agreements signed by the players. However, it appears from the evidence that Nike has on occasion been less than vigilant in enforcing this policy. The existence of lucrative contracts between Nike and prominent players leads the players, as it did in the case of Schmidt, Boone and Unser, to doctor their shoes to look like Nike shoes if they find the Nike shoes uncomfortable and do not wish to wear them. Nike certainly knew of the likelihood of doctoring, just as it knew that by paying large sums of money to players it encouraged them to wear the Nike trademark on whatever shoes they wore. Therefore, Nike's contractual prohibition against doctoring does not shield it from liability.

■ Nike argues in the alternative that Brooks is not likely to succeed on its Lanham Act and misappropriation claims. With respect to the Lanham Act, Nike notes that Brooks has failed to establish that the doctoring activity is either a false designation of origin or false advertisement, both of which are proscribed by the language of Section 43(a).

An examination of the decided cases suggests, however, that this doctoring activity is precisely the sort of "implied passing off" conduct[2] which the Lanham Act prohibits: the use by a business competitor, for purposes of selling his own product, of a misbranded sample or representation of another manufacturer's goods. Thus, in *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210 (8th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976), the court found that Fruehauf's use of photographs of the plaintiff's trailer on which Fruehauf's name appeared in substitution was a violation of Section 43(a). *See also John Wright, supra; Matsushita Electric Corporation of America v. Solar Sound Systems, Inc.*, 381 F.Supp. 64 (S.D.N.Y.1974).

■ Nike argues that the doctored shoes worn by the athletes never entered commerce as was jurisdictionally required. This argument is unpersuasive, since the mere solicitation of sales is "commerce" within the meaning of Section 43(a). *Matushita, supra* at 69. In that case, the court rejected a similar argument that a misbranded radio used to solicit sales at an electronics show had never entered commerce, and instead concluded that it was sufficient that the misbranded unit had been used for the purpose of solicitation of sales. In view of the substantial payments it makes to players, it is obvious that Nike recognizes the considerable advertising and promotional value derived from the endorsements of its shoes by prominent athletes, which are likely to result in increased sales.

■ A party may obtain injunctive relief under Section 43(a) if it establishes a likelihood "that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1130 (2d Cir. 1979), *quoting Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). *See also Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc.*, 482 F.Supp. 980, 990 (S.D.N.Y.1980). In determining whether this likelihood of confusion exists, a court may grant relief "on its own findings without recourse to a survey of consumer reaction," *see American Brands, Inc. v. R. J. Reynolds Tobacco Co.*, 413 F.Supp. 1352, 1356 (S.D.N.Y.1976), if the statement in question is actually false. Certainly, affixing a Nike trademark to a competitor's shoe is a false designation of origin because of the distinctive appearance of the Nike trademark (the wide swoosh-stripe). As a direct conse-

---

2. In their briefs, the parties have characterized the doctoring activity as "reverse palming off," citing *John Wright, supra*. It appears, however, that this activity is more properly characterized as implied passing off, see R. Callman, *The Law of Unfair Competition, Trademarks, and Monopolies*, Cumulative Supp. (Nov. 1980) § 18.2(b)(1), since Nike, in selling its own product, makes use of another's product for advertising purposes, but does not sell the misbranded product itself.

quence of this falsity, potential customers of athletic shoes are misled in their determination of the brand of shoe worn by star professional athletes; many of them relying on this are deceived and their reliance exploited.

It also appears that Brooks is likely to succeed on the merits of its unfair competition and misappropriation claims under the law of New York. *See Flexitized, Inc. v. National Flexitized Corp.*, 335 F.2d 774 (2d Cir. 1964); *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 662 (2d Cir. 1979).

Nike contends that Brooks is not entitled to injunctive relief because it has failed to prove that it has been or is likely to be injured by reason of the doctoring activity. Nike points out that Brooks conducted no empirical study of its sales data and did not demonstrate declining sales or consumer diversion.

In *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186 at 189 (2d Cir. 1980), the court stated that "in an open market it is normally impossible to prove that a customer, who was induced by the defendant through the use of false claims to purchase the product, would have bought from the plaintiff if the defendant had been truthful." The court noted that the passage of Section 43(a) of the Lanham Act "represented a departure from the need to prove actual damages as a prerequisite for injunctive relief." The following test was laid down:

"The statute demands only proof providing a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising. The correct standard is whether it is *likely* that Carter's advertising has caused or will cause the loss of Johnson sales, not whether Johnson has come forward with specific evidence that Carter's ads actually resulted in some definite loss of sales." *Id.* at 190.

At the hearing, Dr. Lawrence Ward, a professor of marketing at the Wharton School of Business, testified that

"the exposure of the Nike emblem [trademark] on shoes of other manufacturers has caused an irreparable injury to Brooks in that sales undoubtedly have been diverted unfairly to Nike by the direct or implied representation that star-quality athletes preferred a Nike shoe when engaged in athletic activity . . . . This unfair diversion of sales to Nike is attributable not only to the direct association in the public mind between a particular athlete and his supposed choice of a Nike shoe but also in the public perception that sizable numbers of players (irrespective of their individual identities) preferred the Nike product."

The testimony of Barry Brown, the owner of a retail store selling athletic products and footwear, supports Dr. Ward's statement that purchasers of shoes often select a certain product because they have seen prominent athletes wearing those shoes.

In view of this testimony, the Court finds that the endorsement of Nike shoes by a prominent athlete is causally related to the sales of the shoes endorsed; thus, Mike Schmidt's wearing of Brooks shoes doctored to resemble Nike shoes was likely to cause purchasers to buy Nike shoes (although had they known they were Brooks shoes, they might have bought Brooks shoes) and thereby has caused Brooks irreparable injury.

Nike argues that Brooks' request for injunctive relief is barred by acquiescence, since Brooks was aware of doctoring incidents at the January 1980 Super Bowl yet waited several months before seeking injunctive relief, and then only after Nike commenced its antitrust suit. Nike contends that Brooks took no action to stop the doctoring and in fact facilitated doctoring by supplying free shoes to athletes who engaged in that practice.

Brooks' delay does not appear to have resulted in prejudice to Nike. *See Alfred Dunhill of London, Inc. v. Kasser Dist. Prod. Corp.*, 350 F.Supp. 1341, 1368 (E.D.Pa.1972). Indeed, the doctoring continued during the 1980 baseball season. On this record, Brooks' delay does not relieve Nike of liability for violations of the Lanham Act.

Nike also argues that a motion for equitable relief may be denied if the party seeking such relief has been guilty of unethical or improper conduct in connection with the subject matter of the litigation. Nike contends that Brooks has displayed "unclean hands" in its dealings with athletes who endorse Brooks shoes and points to aspects of the Brooks advertising and promotional campaign in which certain baseball players are depicted wearing Brooks shoes.

■ The Brooks posters and advertisements indicate puffing but fall short of constituting "clear, unequivocal, and convincing evidence" required to establish the defense of unclean hands. *Schnadig Corp. v. Gaines Manufacturing Co.*, 494 F.2d 383, 392 (6th Cir. 1974); *Waples-Platter Co. v. General Foods Corp.*, 439 F.Supp. 551, 583 (N.D.Tex.1977); *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814–15, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945). Moreover, since injunctive relief is equitable in nature, the Court should consider the public interest in being free from false representations in connection with the advertising of athletic shoes. *See Ames Publishing Co. v. Walker-Davis Publications, Inc.*, 372 F.Supp. 1, 14–15 (E.D.Pa.1974).

In the Nike prospectus dated December 2, 1980 above referred to, it is stated that

"In August, 1980, the Company was one of 11 athletic shoe companies subpoenaed to appear in investigational hearings before the Federal Trade Commission to determine whether the companies have engaged in any unfair methods of competition or unfair or deceptive acts or practices in violation of Section 5 of the Federal Trade Commission Act concerning the advertising and marketing of athletic shoes . . . ."

The record here makes it readily apparent that such an investigation by the Federal Trade Commission is needed. The practices brought out in the evidence are subject to serious abuse in any highly competitive business and call for appropriate standards to prevent such abuse.

The foregoing constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

For the foregoing reasons, Brooks is entitled to a preliminary injunction enjoining Nike from authorizing, permitting or causing the doctoring of Brooks shoes with the Nike trademark.

Settle form of injunction within ten days.