**BROADCAST MUSIC, INC., Plaintiff,**

v.

**FOX AMUSEMENT COMPANY, INC., etc., et al., Defendants.**

**No. 81 C 6216.**

United States District Court, N.D. Illinois, E.D.

Nov. 16, 1982.

Marshall Patner, Chicago, Ill., Stuart, Zavin & Sinnreich, New York City, for plaintiff.

James G. DelGiudice, Erbacci, Syracuse & Cerone, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Broadcast Music, Inc. ("BMI") has sued Fox Amusement Company, Inc. ("Fox"), William Daddono ("Daddono") and Michael Lupo ("Lupo"), asserting 57 claims of copyright infringement under the new Copyright Act, 17 U.S.C. §§ 101 et seq. (the "Act"). BMI seeks injunctive relief, statutory damages and an award of attorneys' fees and costs.

BMI has moved under Fed.R.Civ.P. ("Rule") 56 for summary judgment based on appropriate supporting materials,[1] while defendants have countered only with an answering legal brief. For the reasons stated in this memorandum opinion and order BMI's motion is granted, and it is awarded $250 in statutory damages on each of its 57 claims, plus attorneys' fees and costs. However, BMI's prayer for injunctive relief is denied.

*Facts* [2]

BMI is a performing-rights licensing organization that obtains public performing rights in copyrighted music of independent writers and publishers. In turn it licenses such rights directly to broadcasters and entertainment establishments. As for "coin-operated phonorecord players" (juke boxes), however, BMI and other licensing organizations grant licenses indirectly. Juke box operators pay annual fees to, and obtain compulsory licenses from, the Register of Copyrights (the "Register"). All such juke box fees are deposited into a Department of Treasury fund, from which BMI and other licensing organizations are paid proportionate shares as determined under the Act. 17 U.S.C. § 116(b) and (c). Of course BMI pays its affiliated writers and publishers out of its direct and indirect licensing receipts.

Fox operates well over 100 juke boxes in numerous commercial establishments in Illinois. It has admitted (Ans. ¶ 7) it is the operator of the 11 juke boxes referred to in Complaint ¶ 7. Fifty-seven BMI-licensed copyrighted musical compositions were played on those 11 juke boxes on various dates in 1981 (the latest date covered by BMI's showing was November 11). Fox operated those juke boxes on those dates without having affixed a registration certificate showing a 1981 license payment to the Register.[3]

*Summary Judgment Principles*

Rule 56 is exceedingly plain in its demands on a party opposing summary judgments. Though some aspects of Rule 56's procedures or operating principles may require analysis or research, even the uninitiated can hardly mistake the thrust of Rule 56(e):

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon

---

1. Defendants' Answer ("Ans.") to the Second Amended Complaint (the "Complaint") contains numerous admissions. Other admissions by defendants to interrogatories and to requests for admissions supplement BMI's showing. Finally BMI has submitted affidavits under Rule 56(e).

2. This statement is drawn from BMI's unopposed factual presentation. Where reasonable inferences may be drawn in defendants' favor (as summary judgment doctrine requires, *see*

*United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)), such inferences are referred to at appropriate places in this opinion.

3. As discussed later in this opinion, defendants applied for the required licenses late in 1981. They argue 16 of the 57 alleged infringements (having occurred after the filing date) are therefore erased. They are wrong on the facts, so that the legal question need not be decided.

the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

There can thus be no excuse for the thundering silence (in evidentiary terms) with which defendants have met BMI's motion and supporting materials. It simply will not do to refer to what "the evidence will show" (Def.Br. 2), to what Daddono and Lupo "will testify" (Def.Br. 5) or to what "Defendants believe that the testimony and evidence presented at trial will establish" (Def.Br. 6). And when the situation remains uncured weeks after BMI's Reply Br. 4 has set out Rule 56(e) in full, *underscoring* the entire two sentences quoted in this opinion, this Court can only apply the Rule in its literal terms.

That does not mean of course the movant acquires an automatic entitlement to all the relief sought. This Court always applies the favorable inference principle referred to at n. 2, and the movant's own presentation may well confirm the existence of material factual issues limiting or precluding summary judgment. *See Thornton v. Evans,* No. 81–1007, slip op. at 20–21 (7th Cir. Nov. 1, 1982).

This opinion will treat with each of BMI's claims in turn against the backdrop of those principles. They support the principal part—though not all—of the relief BMI seeks.

### *Fox's Liability*

■ BMI's submissions and defendants' own filings show there is no genuine issue as to any fact material to Fox's liability. Each element essential to establishing such liability is uncontroverted:

1. originality and authorship of the compositions involved (Complaint ¶ 4, Sched. 1 and Ans. ¶ 4; Pl. Request for Admission ¶ 2 and Def. Reply to Pl. Request for Admissions ¶ 2);

2. compliance by the copyright holders with all formalities required to secure the relevant copyrights (Affidavit of BMI's Assistant Vice President Elizabeth Granville ["Granville Affid."] at 2);

3. BMI's proprietorship of those copyrights (Complaint Sched. 1 and Granville Affid. at 2);

4. public performance of the compositions involved for profit (BMI "loggers' " affidavits and Complaint Sched. 1);

5. Fox's allowance of the performance of the compositions without the required licenses [4] and without BMI's permission (Def. Reply to Pl. Request for Admissions ¶¶ 10, 11; BMI loggers' affidavits).

*See George Simon, Inc. v. Spatz,* 492 F.Supp. 836, 838 (W.D.Wis.1980); *Chess Music, Inc. v. Tadych,* 467 F.Supp. 819, 821 (E.D.Wis.1979).

In fact Def.Br. at 1–2 generally concedes Fox's liability. Defendants contest only 16 of the alleged infringements because they occurred after October 23, 1981, the date Fox assertedly applied and paid for its 1981 licenses (Def.Br. 2–3).[5] One possible and one certain answer refute that contention.

■ First, the Act required Fox to apply for its licenses in January 1981 and to affix the licenses to the juke boxes on or before March 1.[6] Failure to file the required ap-

---

**4.** Defendants' limited contention on that issue is discussed and rejected later in this section of the text.

**5.** At best that date is inaccurate. Fox's own check bears an October *28,* 1981 certification date. Def. Answers to Interrogatories App. Payment was not received by the Copyright Office until November 4. Issuance of the registration certificates for the juke boxes (for which the Copyright Office is allowed 20 days, 17 U.S.C. § 116(b)(1)(B)) did not take place

until November 20. Letter, U.S. Copyright Office, Sept. 16, 1982, R.Br.App. at 1 ("Copyright Office Letter").

**6.** Those deadlines applied to juke boxes in service in 1980. 17 U.S.C. § 116(b)(1)(A) and (C). BMI's Br. 14–15 reflects two of the eleven juke boxes were placed in service in 1981. But those two required applications within one month of placement. 17 U.S.C. § 116(b)(1)(A).

plications or to affix the issued certificates renders public performance of the covered music compositions actionable as infringements. 17 U.S.C. § 116(b)(2). So Fox's late 1981 compliance might arguably render *any* 1981 performance (even after the tardy payment) an infringement.

■ But it need not be determined whether such a construction of the Act is really tenable. As n. 5 reflects, Fox's 1981 licenses did not *issue* until November 20. Thus Fox could not possibly have affixed the required license certificates to its juke boxes until *after* the last (November 11) of the infringements it disputes. Because any performance without such affixing is actionable, there is no factual issue that could eliminate Fox's liability for any of the 57 infringements.

### Liability of Daddono and Lupo

■ BMI Br. 15–18 contends Daddono and Lupo are personally liable for Fox's infringements. It bases that contention on several facts establishing Daddono and Lupo closely direct the business of Fox and own Fox equally. Br. 16–17.

For personal liability purposes, the critical fact is the clear responsibility of Daddono and Lupo for Fox's annual application for its compulsory juke box licenses. Although Ans. ¶¶ 15 and 16 deny their active involvement in the conduct of Fox's business and the determination of its relevant policies, the uncontradicted facts of record show Daddono and Lupo together bear Fox's licensing obligations. They both admit knowledge of the content of Fox's pre-1982 licenses (Def.Ans. to Interrogatory 15(c)), and Daddono is the individual preparer of the Fox applications and the signatory of the payment checks (Def.Ans. to Interrogatories App.). Indeed, their joint responsibility is effectively conceded by the

"defense" they offer at their Br. 5: Each thought the other had made the required 1981 payments (see n. 8). That "defense" confesses the responsibility of each for obtaining Fox's licenses and establishes each was in a position to police Fox's compliance with the Act.

Establishment of that latter fact makes Daddono and Lupo, who admittedly are controlling co-owners of Fox, personally liable for Fox's infringements as a matter of law. *See Boz Scaggs Music v. KND Corp.*, 491 F.Supp. 908, 913–14 (D.Conn.1980). *See also Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1161–62 (2d Cir.1971). Judgment will be entered against them as well as Fox.

### Amount of Damages

BMI has opted for statutory damages under 17 U.S.C. § 504(c): between $250 and $10,000 per infringed copyright, as the trial court considers just (Section 504(c)(1)). Section 504(c)(2) enlarges the court's discretion in each direction: (1) up to $50,000 per infringed work if committed willfully or (2) down to $100 per infringed work in what the legislative history[7] called a case of "occasional or isolated innocent infringement."

BMI Br. 21 contends this Court ought to award more than the statutory minimum on the theory defendants were willful infringers. But though the specific *facts* of infringement are uncontradicted, they do permit reasonable *inferences* in defendants' favor that would negate willfulness or other aggravating circumstances.

Although the documentation is somewhat unclear as to the specific dates, Fox made late applications every year before 1981—apparently in March 1978 and 1979, and as late as December in 1980. Copyright Office Letter, Pl.R.Br.App. at 1; Def.Ans. to Interrogatories App., certified check receipt dated Dec. 6, 1980. Of course it would be

---

Thus the applications were untimely as to those juke boxes as well. Complaint Sched. 1 at Col. 8, (E) and (I).

7. H.R.Rep. No. 1476, 94th Cong.2d Sess. 163, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5779.

possible to infer from that pattern, as BMI urges (Br. 2):

> Other operators [of juke boxes], such as the present defendants, began by complying with the new requirements [under the new Copyright Act] when they first went into effect, but then at some later point apparently decided to test the waters by seeing what, if anything, would happen if they neglected to renew the registrations of their boxes for a given year.

However, as BMI must recognize, to draw such an unfavorable inference, which could lead to a greater mulcting of defendants in damages, is precisely the converse of what this Court should do on BMI's summary judgment motion.

■ Instead this Court takes a different look at the same pattern of prior payments, coupled with the fact Fox's 1981 payment was made shortly after BMI's lawyer (unaware of Fox's identity) wrote to proprietors of locations containing three of the unregistered juke boxes. It can and does draw from those combined facts the inference of a non-willful infringement.[8]

■ That is not the end of the matter in terms of damage assessment, however. Fox's interrogatory answers and license applications confirm it operates something close to 125 juke boxes in Illinois (not just the 11 checked by BMI's loggers), and all were unregistered during nearly all of 1981. In deciding where defendants should be placed on the broad spectrum of statutory damages for the few infringements BMI's loggers were able to police in short observation periods, this Court can reasonably consider what the impact of the *minimum* minimum statutory figure ($100 per infringed

work under Section 504(c)(2)) would have been had *all* Fox's offending juke boxes been checked by the loggers to the same extent. It would have taken only 143 infringed works (hardly an unreasonable prospect with 125 machines) at $100 each to reach a higher damage level than is produced by the $250 normal minimum applied to the 57 observed infringements.[9]

Taking all the circumstances into account, and drawing all inferences in defendants' favor, this Court has determined that a per-infringement damage award of the normal $250 minimum level is a reasonable exercise of its broad statutory discretion. Accordingly damages are awarded in the amount of $250 for each work infringed, or $14,250 in total.

### Attorneys' Fees and Costs

■ Another section of the Act permits a discretionary award of attorneys' fees to the prevailing party in an infringement action. 17 U.S.C. § 505. Denial of such fees here would have the practical effect of reducing BMI's net recovery below the amount this Court views as reasonable statutory damages. Indeed the analysis in the preceding section of this opinion was in specific contemplation of BMI's undiminished realization of the full amount awarded. No special factors justify changing that result by a denial of attorneys' fees. *See Boz Scaggs,* 491 F.Supp. at 915 (discussing predecessor of Section 505).

BMI has submitted the affidavit of attorney Jonathan Zavin reflecting fees of $5,575 to September 17, 1982. This Court awards that amount—defendants do not contest its reasonableness (Def.Br. 8–9). Of

---

8. Again, Def.Br. 5—not supported by a counter-affidavit, to be sure—says each individual defendant thought the other had paid the 1981 registration fee. BMI counters in effect that believing such an Alphonse and Gaston routine is like believing in the tooth fairy. Whether or not the precise unsworn version is to be credited is irrelevant. It is surely reasonable to draw, whether or not for the stated reason, an inference of non-willfulness from the undisput-

ed facts of record. This is true despite the fact the same evidence supports Daddono's and Lupo's legal *responsibility.*

9. It may perhaps be objected that this is the equivalent of imposing liability for unproved infringements. Not so. Instead the Court simply recognizes the real world consequences of the undisputed facts, and it applies them to the *proved* infringements.

course, the amount may be adjusted for attorneys' fees between September 17 and the date of this opinion. This Court also awards BMI the costs of this action.

*Injunctive Relief*

■ After this suit was filed Fox made timely payment of its 1982 fees to the Register (Copyright Office letter, BMI R.Br. App. 1). Its 1983 fees are due to be paid in January. Thus, there is no present violation of the Act, and a future violation is speculative—especially in light of the outcome of this action. This Court declines to exercise its discretion under 17 U.S.C. § 502 to grant injunctive relief on this record.[10]

*Conclusion*

For the reasons stated this Court finds there is no genuine issue as to any fact material to the liability of all defendants, and therefore BMI is entitled to a judgment as a matter of law. BMI is granted judgment against Fox, Daddono and Lupo jointly and severally for damages in the amount of $14,250. BMI is also awarded costs, plus attorneys' fees in the amount of $5,575 (subject to possible increase on a further showing).[11] BMI's prayer for injunctive relief is denied.

---

**10.** Were Fox to violate the Act in the future, the court considering that violation would have ample weaponry in its arsenal—the wide range of statutory damages available—to deal with a more likely determination of willfulness.

**11.** BMI is given leave to file (and to deliver to defendants' counsel) a supplemental statement as to fees on or before November 22, 1982. Defendants are given leave to file (and to deliver to BMI's local counsel) any objections to that statement on or before November 29, 1982.