POLYGRAM INTERNATIONAL PUB-
LISHING, INC., Yellow Brick Road Mu-
sic, Aerostation Corp., MCA, Inc.,
Bourne Co., Williamson Music, Inc., Cy
Coleman, Jobete Music Co., Inc., Brock-
man Enterprises, Inc., Fourth Floor Mu-
sic, Inc., Hudmar Publishing Co., Inc.,
Cowbella Music, Bleu Disque Music Co.,
Inc., WB Music Corp., and Webo Girl
Publishing, Inc., Plaintiffs

v.

NEVADA/TIG, INC., f/k/a Interface Group,
Inc., Interface Group–Massachusetts,
Inc., and Interface Group–Nevada, Inc.,
Defendants and Third Party Plaintiffs

v.

McGRAW–HILL, INC., Third
Party Defendant.

Civ. A. No. 92–10785–REK.

United States District Court,
D. Massachusetts.

June 20, 1994.

Stephen S. Young, Sherburne, Powers & Needham, Boston, MA, for plaintiffs.

Franklin H. Levy, Abrams, Roberts, Klickstein & Levy, Boston, MA, for defendants and third party plaintiffs.

Michael J. Liston, Glass, Seigle & Liston, Boston, MA, for third party defendant.

## OPINION

KEETON, District Judge.

This is a civil action for copyright infringement. Jurisdiction is based on 28 U.S.C. § 1338(a). Plaintiffs are members of the American Society of Composers, Authors, and Publishers (ASCAP) and are the copyright holders of ten songs played by various exhibitors and entertainers at a computer trade show and awards ceremony. Defendants organized the trade show and co-sponsored the awards ceremony. Plaintiffs seek to hold defendants liable under the federal Copyright Act, 17 U.S.C. § 101 *et. seq.*, for ten counts of copyright infringement based on performances of copyrighted music by the exhibitors and entertainers.

The contentions of the parties raise two questions of first impression in this Circuit: first, whether a trade show organizer is liable, either vicariously or as a contributory

infringer, for the copyright violations of its exhibitors and entertainers; second, whether the defendant in a copyright action can recover either contribution or indemnity from a third-party defendant. The disposition of the case, however, turns on the determination of the required elements of a prima facie case of copyright infringement.

For the reasons stated below, I conclude that plaintiffs have failed to establish a prima facie case of copyright infringement and that judgment for the defendants must enter. Because I have had to decide reasonably disputable legal issues, however, and a higher court might decide them differently, this Opinion, to facilitate final disposition, also addresses other issues bearing on liability and damages.

## I. Procedural History

Early in the history of this case, the parties filed cross-motions for summary judgment. As a matter of prudential case management, it is my practice to discourage such motions and to encourage, in their stead, a trial on stipulated facts of the potentially dispositive issues that are the subject of one or both of the proposed cross-motions. This practice often results in a more efficient use of judicial resources because it allows the court to decide the case in one proceeding even if concluding that the stipulated historical facts leave undecided some evaluative adjudicative fact that must be resolved by a finding of "fact" rather than decision "as a matter of law." *See, e.g., Continental Grain v. Puerto Rico Maritime Shipping*, 972 F.2d 426, 429 n. 7 (1st Cir.1992) (commending to district courts the use of this procedural alternative to cross-motions for summary judgment); *see also Buirkle v. Hanover Ins. Companies*, 832 F.Supp. 469, 471–72 (D.Mass.1993).

The parties were receptive to the court's suggestion of a trial, and on February 9, 1994, the parties appeared before the court for a one-day, non-jury trial. Affidavits, deposition transcripts, an exhibit book, stipulations, and proposed findings were received in evidence. *See* Transcript, Docket No. 63. The American Society of Association Executives earlier filed a brief *amicus curiae* (Docket No. 16).

During the trial, each party made objections to parts of the evidence offered by the party's opponents. Some of the evidence was received for limited purposes only; other objections were reserved. As to the reserved objections, I find, as fact-finder, that fully weighing the challenged evidence would not lead me to make findings different in any way from those recited in this Opinion. The objections are therefore moot.

## II. Findings of Historical Fact

Defendant Nevada/TIG, Inc. was dismissed from this case by stipulation (Docket No. 21). The two remaining defendants, Interface Group–Massachusetts, Inc. and Interface Group–Nevada, Inc. (collectively "Interface") organize and promote major conventions and trade shows, including the world's largest trade show for the computer industry, "COMDEX/Fall."

The plaintiffs are members of the American Society of Composers, Authors, and Publishers (ASCAP), and have granted to ASCAP the non-exclusive right to license public performances of their copyrighted musical compositions. ASCAP functions as a clearinghouse that takes in license fees from those who wish to perform or authorize performances of copyrighted material and then distributes these fees, after deducting operating costs, to its more than 50,000 members. ASCAP also prepares and conducts copyright infringement litigation on behalf of its members to enforce their copyrights. ASCAP's royalty distributions are the single largest source of income for most composer and songwriter members.

Almost two years before the COMDEX/Fall show, ASCAP communicated with Interface in the hope of entering into a license agreement that would authorize performances of any of the copyrighted music in the ASCAP repertory at Interface's trade shows. ASCAP has licensed other trade show organizers, but despite repeated offers by ASCAP, Interface did not obtain a similar trade show license, which would have cost about $4,000 for the COMDEX/Fall show. Interface states that it believed no license

was necessary for the COMDEX/Fall show because Interface itself did not intend to perform any music.

The COMDEX/Fall show was held in October, 1991, in Las Vegas. The show occupied over 2.5 million square feet in seven separate convention centers and hotels. Over 2,000 exhibitors rented space from Interface for exhibition booths from which they could display their wares. Exhibitors were responsible for the content of their booths, but they were required to abide by the general Rules and Regulations established by Interface. Rule 1 of these Rules and Regulations forbids exhibitors from using music at a volume that might intrude upon adjacent exhibit areas, and advises exhibitors that it is their responsibility to obtain proper copyright licenses from ASCAP or other licensing authorities for any music played.

During the five days of the show, about 132,000 persons attended. Two of these attendees were investigators for ASCAP, who overheard copyrighted music of the plaintiffs being performed at five exhibition booths. Specifically, the investigators heard the following copyrighted songs: "Man in the Mirror" and "ABC" (Proton booth), "Three Times a Lady" and "Third Rate Romance" (Televideo booth), "Africa" (LSI booth), "Into the Groove" (Neotec booth) and "Into the Groove" (Darius booth).

The investigators also attended the "Best of COMDEX" awards ceremony, which was co-sponsored by Interface and BYTE magazine, a McGraw–Hill publication. The awards ceremony was held in the Hilton hotel, in a ballroom leased by the Interface group. According to the written agreement between Interface and BYTE, Interface was responsible for promoting the ceremony to the public and press and for supplying "all audio/visual needs" for the ceremony; BYTE was responsible for the content of the ceremony.

The top prizes at the awards ceremony were called "Shellys" in honor of Interface president Sheldon Adelson. Advertising for the event compared "Shellys" to the "Oscars" of the film industry and invited the show attendees to a "Gala Award Ceremony" in the Las Vegas Hilton Showroom.

At the awards ceremony, the ASCAP investigators heard a disc jockey and a band, the "Jazz Barons," perform the following songs: "The Way You Look Tonight," "I'll Take Romance," "Hey, Look Me Over," and "Strike Up The Band." Plaintiffs own the copyright on each of these songs.

No party offered any evidence at trial on how the disc jockey came to be performing at the awards ceremony. The band was obtained by the Public Relations Manager of BYTE Magazine, Dawn Mathews, through the Las Vegas Hilton Hotel. The requisition form for the band states that the Hilton "is acting as the agent for the Convention in booking the entertainment services."

Interface derived its profit from COMDEX/Fall from three sources: booth rentals at $35.95 per square foot, admission fee charges of $75 per person for attendees, and advertising revenues. Gross revenues from these three sources at COMDEX/Fall exceeded $44 million. Interface did not earn any revenue directly from any business activity generated at exhibitors' booths, or from the Best of Comdex awards.

## III. The Prima Facie Case

### A. The Legal Background

The federal Copyright Act grants to the owners of copyrights in musical works the exclusive right, with express limitations, to perform or to authorize public performances of the work. 17 U.S.C. § 106(4). Anyone who violates the exclusive rights of the copyright holder is an infringer, for whose acts the copyright holder may seek actual or statutory damages, id. § 504(a), injunctive relief, id. § 502(a), and reimbursement of the costs of suit, including a reasonable attorney's fee, id. § 505.

■ The purpose of the Copyright Act is to protect the interests of composers and authors by granting them a limited, legal monopoly over the publication and performance of their artistic works. See Sony Corp. v. Universal City Studios, Inc., 464 U.S. 417, 429, 104 S.Ct. 774, 782, 78 L.Ed.2d 574 (1984); Herbert v. Shanley Co., 242 U.S. 591, 37 S.Ct. 232, 61 L.Ed. 511 (1917). "It is said that reward to the author or artist

serves to induce release to the public of the products of his creative genius." *United States v. Paramount Pictures Inc.,* 334 U.S. 131, 158, 68 S.Ct. 915, 929, 92 L.Ed. 1260 (1948). It may also be said that payment to authors or artists is a matter of fairness when others make use of their creations. *Cf. Chess Music, Inc. v. Sipe,* 442 F.Supp. 1184, 1185 (D.Minn.1977) ("Those who profit from copyrighted music are obliged to pay not only the piper but the author.")

■ If a copyright infringement is proved, the copyright holder may ask a court to impose liability for the infringement on third parties rather than on the direct infringer. Although this derivative liability for third parties is not expressly stated in the statute, the Supreme Court has held that "[t]he absence of such express language in the copyright statute does not preclude the imposition of liability" on third parties. *Sony,* 464 U.S. at 435, 104 S.Ct. at 785. Indeed, courts have long recognized that, in order to protect the copyright holder's statutory monopoly, parties other than the direct infringer must often be held accountable for copyright infringements. *See, e.g., Gershwin Publishing Corp. v. Columbia Artists Management, Inc.,* 443 F.2d 1159, 1161–62 (2d Cir.1971) (citing cases).

Two forms of third-party liability have been recognized in the case law: vicarious liability, derived from the similar concept in the law of employer-employee relations, and contributory infringement, derived from the tort concept of enterprise liability. *See Demetriades v. Kaufmann,* 690 F.Supp. 289, 292 (S.D.N.Y.1988) (citing cases and distinguishing between vicarious and contributory infringement). Plaintiffs in this case argue that they have established a prima facie case of copyright infringement, and they seek to hold Interface liable as a third party under theories of both vicarious and contributory liability.

### B. *Elements of the Prima Facie Case*

■ To establish a prima facie case of copyright infringement, a plaintiff must demonstrate (1) originality and authorship of the work involved; (2) compliance with all formalities required to secure a copyright under the Act; (3) plaintiff's ownership of the copyright in question; (4) public performance of the work; and (5) lack of authorization for the performer to perform the work. 17 U.S.C. §§ 101–106, 501. *See also Jobete Music Co., Inc. v. Massey,* 788 F.Supp. 262, 265 (M.D.N.C.1992). An earlier requirement that the performance also be for "profit" was eliminated through amendments of the Copyright Act effective January 1, 1978. 17 U.S.C. § 106; *see also* H.R. 94–1476, *reprinted in* 17 U.S.C.A. § 106 (West 1977) at 103 (discussing reasons for eliminating profit requirement).

It is undisputed that plaintiffs have established the first four elements of their prima facie case: the parties stipulated that the plaintiffs are the true owners of valid copyrights to ten musical works that were performed by others at the trade show and awards ceremony. And, performance of the works in "any place where a substantial number of persons outside of the normal circle of a family and its social acquaintances is gathered" constitutes public performance of the work, 17 U.S.C. § 101; thus this element of the prima facie case has been met. The final element, lack of authorization for the alleged infringer to perform the work, creates the only area of dispute.

### C. *Burdens of Proof and Production*

■ The parties have stipulated that Interface was not authorized to perform the works. The record remains silent, however, on whether one or any of the exhibitors, the Jazz Barons, or the disc jockey, were licensed or had received permission directly from the authors for the performances. Plaintiffs and Interface each contend that the other has the burden of proof on the issue of authorization and that the silent record demonstrates failure to meet that burden. Both arguments are cogent, but of course one must fail.

On the one hand, it is hard to fault defendant's argument that plaintiffs should not be allowed to impose liability on a third party for vicarious or contributory infringement without proof that an infringement in fact occurred. Some of the case law and treatises

make this point explicitly. For example, the Supreme Court made clear in *Sony* that the burden of proving a direct infringement rested on the plaintiffs:

> To prevail, [plaintiffs] have the burden of proving that users of the Betamax have infringed their copyrights and that Sony should be held responsible for that infringement.

*Sony,* 464 U.S. at 434, 104 S.Ct. at 785. Other cases are in accord. *See, e.g., Danjaq, S.A. v. MGM/UA Communications, Co.,* 773 F.Supp. 194, 201–02 (C.D.Cal.1991) (contributory infringement does not lie without proof of direct infringement), *aff'd* 979 F.2d 772 (9th Cir.1992); *see also* 1 Paul Goldstein, *Copyright* § 6.1, at 705 (1989) ("It is definitional that, for a defendant to be held contributorily or vicariously liable, a direct infringement must have occurred.").

This common-sense requirement that liability may not attach unless plaintiff establishes a prima facie case for the infringement comports with basic tort doctrine in cases of third-party liability. The most obvious example, of course, is that employers are not held vicariously liable unless plaintiff can first establish that an employee committed a tort.

On the other hand, district courts in this circuit appear to have handled the burden of proof somewhat differently in copyright cases with facts somewhat similar to this one. The cases are legion in which restaurant and nightclub owners have been held liable for copyright infringements by bands or solo performers without any explicit finding that the performers themselves were unlicensed. The courts in these cases appear to accept the *owner's* admission of the owner's lack of license as establishing a prima facie case of copyright infringement, without requiring further evidence of the *band's* lack of authorization. *See, e.g., Marvin Music Co. v. BHC Ltd. Partnership,* 830 F.Supp. 651 (D.Mass.1993) (defendant club owners who concede own lack of authorization held liable for infringement based on live and recorded music); *Broadcast Music, Inc. v. Larkin,* 672 F.Supp. 531 (D.Me.1987) (defendant owners who admit own lack of authorization held liable for infringements by band); *Sailor Music v. Mai Kai of Concord, Inc.,* 640 F.Supp. 629 (D.N.H.1986) (holding defendant who conceded lack of authorization liable for infringement by band); *Cass Cty. Music Co. v. Vineyard Country Golf Club,* 605 F.Supp. 1536 (D.Mass.1985) (defendant lounge owner who admitted lack of license held liable for copyright infringement by guitarist); *Famous Music Corp. v. Bay State Harness Horse Racing,* 423 F.Supp. 341 (D.Mass. 1976) (holding manager of race track liable for alleged infringement by musicians without stating evidence that musicians were unlicensed), *aff'd* 554 F.2d 1213 (1st Cir.1977).

Did the burden of production implicitly shift to the defendants in these cases on the ground that the owner of an establishment is more likely than a copyright holder to have control over itinerant musicians and thus is better able to produce a license agreement, if one exists? Or, is it more likely that the defendant in each of these cases simply did not challenge plaintiff's assertion of copyright infringement by the musicians, and the court simply had no reason to consider this issue?

■ To be clear, I note that this distinction between the *performer's* lack of authorization and the *defendant's* lack of authorization is material only in the context of third-party liability cases. In direct liability cases—for instance, those involving jukeboxes and radios—a lounge owner who runs his own establishment can be held directly liable for playing music without authorization because the owner himself is "performing" the music as that term is defined in the Copyright Act. *See* 17 U.S.C. § 101 ("To perform a work means to ... play ... it, either directly or by means of any device or process."). Thus in these direct infringement cases, the issue is not whether some other person involved in the recorded performance had an authorization but instead whether the owner of the establishment where that re-

cording was played had an authorization. The courts have no reason in cases of this kind to look beyond the owner's own concession of lack of authorization. *See, e.g., Little Mole Music v. Spike Inv., Inc.,* 720 F.Supp. 751 (W.D.Mo.1989) (managers of jukebox company held directly liable based on own admissions); *Rare Blue Music, Inc. v. Guttadauro,* 616 F.Supp. 1528 (D.Mass.1985) (lounge owner held directly liable for unauthorized playing of copyrighted songs on jukebox); *see also Pedrosillo Music Inc. v. Radio Musical, Inc.,* 815 F.Supp. 511, 515 (D.P.R.1993) (prima facie case established based on defendant radio station's admission of lack of authorization); *Merrill v. County Stores, Inc.,* 669 F.Supp. 1164 (D.N.H.1987) (store owner who admitted lack of permission held directly liable for broadcasts of radio music in store).

■ In cases involving live performances by musicians or disc jockeys, however, the only bases for liability of the nightclub owner are vicarious and contributory liability, because the owner is not performing the work. Only the actual performer—the musician or the disc jockey—is a direct infringer. This distinction was clear in the leading cases on third-party liability, and courts in these early cases were careful to find an actual infringement by the alleged direct infringer. *See Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 306 (2d Cir.1963) (department store held vicariously liable for acts of its concessionaire, a "conceded infringer"); *Gershwin Publishing Corp. v. Columbia Artists Management Inc.,* 443 F.2d 1159 (2d Cir.1971) (noting that defendant manager "concedes" that the artists performed the work without the permission of the copyright owner "and that the performing artists … are therefore liable under the Copyright Act"); *see also Chess Music, Inc. v. Sipe,* 442 F.Supp. 1184 (D.C.Minn. 1977) (after band members testify at trial that they were unaware music was copyrighted, court determines "[t]here is no doubt that the performances in question were per-

formed … without the permission of the copyright owners").

Some later cases have failed to explain the basis of liability as carefully, *see, e.g., Cass Cty. Music Co. v. Vineyard Country Golf Club,* 605 F.Supp. 1536 (D.Mass.1985) (holding third party liable without referring to vicarious or contributory liability and without explicitly finding proof of direct infringement), but other lower court decisions, as well as the Supreme Court statement in *Sony,* make clear that proof of a direct infringement *by the performer* is a required element for plaintiffs' prima facie case of copyright infringement. Cases that may be interpreted as founded on a contrary assumption, in this and other circuits, are not directly on point because in none of them is it stated that the defendant denied that a direct infringement occurred; it is possible that the fact was obvious and never contested. In the case now before the court, however, the defendant has declined to stipulate that any of the performers was unauthorized and now contends that this element is unproved.

■ I conclude that the plaintiff has the burden of proof on the issue of authorization. It may nevertheless be true, however, that after some kind of showing by a plaintiff, a defendant may bear a burden of *production.*

I am aware of only one case—and the parties have cited no other—in which the court explicitly considered shifting to the defendant a burden that was at least a burden of production, and perhaps more, after plaintiffs had done nothing other than allege a prima facie case. In that case, *Blendingwell Music, Inc. v. Moor–Law, Inc.,* 612 F.Supp. 474 (D.Del.1985), the court granted summary judgment against a defendant saloon owner based on his vicarious liability for alleged copyright infringements by a country music band at the saloon. There is no evidence in the case that the band was unauthorized to perform the copyrighted works, but the court nevertheless concluded that the plaintiff had done enough to shift the burden to the defendant:

The Court feels that once a lawful proprietor of a copyright alleges that a perfor-

mance of a copyrighted work was unauthorized, the burden shifts to the defendants to show a genuine issue of fact exists that the performance was authorized.

*Id.* at 481.

█ In the case of copyright infringements by itinerant musicians or other, transient performers, it may very well be that a defendant who hires the musicians is in a better position than the copyright holder to establish whether the musicians are authorized to perform, and that once a plaintiff makes an initial showing of a prima facie case (at least if plaintiff offers an evidentiary showing, perhaps based only on a good faith statement of information and belief), a burden of production should shift to the defendant. I conclude, however, that even if a court adopts a rule of procedural law that shifts to the defendant a burden of production, the plaintiff cannot invoke that rule without at least making a statement, under the pains and penalties of perjury, that the plaintiff believes the performers were unauthorized.

█ For the foregoing reasons, I conclude that the plaintiffs in this case have an initial evidentiary burden to come forward with some statement that the performers of the copyrighted works did not have authorization from the copyright holders or their agents. On the record now before the court, the plaintiffs never explicitly contended that the exhibitors, band, or disc jockey were unauthorized. Plaintiffs put forward no evidence of a direct infringement. They did not purport to say that ASCAP had searched for and found no record of licensing any of the five exhibitors, the disc jockey, or the Jazz Barons. They did not say that no plaintiff had personally authorized any of the performances. Even if I were to hold that a settled legal rule, or a newly fashioned rule, shifts the burden to the defendants to come forward with proof of authorization once the plaintiffs make a good faith affirmation that the performers lacked authorization, the plaintiffs have not done enough to invoke the rule in this case.

Because plaintiffs have failed to allege any direct infringement, I conclude that it is immaterial to the outcome of this case whether some kind of showing might be enough to shift a burden of production to the defendants on the issue of authorization.

I note that in an earlier motion for summary judgment in this case, the plaintiffs *did* allege, in the affidavit of L. Barry Knittel, that the performers were unauthorized:

Interface has failed to obtain authorization for performances of copyrighted music of ASCAP's members' copyrighted music at its conventions and trade shows, including the COMDEX/Fall '91 trade show. *I believe also that none of the exhibitors present, nor BYTE magazine, obtained authorization to perform any of the ten songs involved in this case.*

Affidavit of Director of Licensing for ASCAP, L. Barry Knittel, ¶ 40 (Docket No. 22) (emphasis added). This paragraph was deleted from the affidavit of L. Barry Knittel that was entered in evidence at trial. No other affidavit in evidence refers to the lack of authorization for the *performers.* It is not sufficient for plaintiffs to make the legal argument, as they do in their trial brief, that the songs were "performed without authorization," when the supporting evidence they cite in the record is only a stipulation that *Interface* was not authorized and there is no good faith allegation that the performers were unauthorized. (Trial Brief, Docket No. 48, p. 2).

Plaintiffs have chosen a strategy of seeking a ruling based on minimal evidence—a ruling that, if affirmed on appeal, would establish a precedent extraordinarily favorable to ASCAP members. In doing so, they have elected not to press, in the alternative, a more modest claim for a less dramatically favorable precedent. Of course, they will remain free, on another day in another case, to make a more modest claim. The down side of pursuing such an all-or-nothing strategy, however, is that the court may conclude, as I have, that it leaves the court with no supportable choice but to award nothing.

I conclude, then, that although other courts have imposed liability on third parties without an explicit finding of a direct infringement, I cannot properly do so in this case. The record in this case provides no

basis either to assume or to find that a direct infringement occurred. Plaintiffs have the burden of proof, although not necessarily the burden of production at every stage of trial, to establish each element of their prima facie case of copyright infringement. Because plaintiffs have failed at trial to establish the fifth element, the *performer*'s lack of authorization for the copyrighted performance, defendants are entitled to judgment.

As stated above, however, I will proceed to address the other issues in this case, for all the performances at issue, in order to create a full record that includes all potentially material factual findings.

## IV. Vicarious Liability

### A. *In General*

In *Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304 (2d Cir.1963), the Second Circuit articulated what has become the acknowledged standard for a finding of vicarious liability in the context of copyright infringement:

> When the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials—even in the absence of actual knowledge that the copyright monopoly is being impaired—the purposes of copyright law may be best effectuated by the imposition of liability upon the beneficiary of that exploitation.

*Shapiro, Bernstein,* 316 F.2d at 307 (internal citations omitted). The court derived these two elements—the right and ability to supervise and an obvious and direct financial interest—from two contrasting lines of precedent under the copyright laws. Under one set of cases, in which landlords were exempted from liability for the copyright infringements of their tenants, the court noted that the landlords received only a fixed rental fee from the tenants, did not know of the tenants' copyright infringements, did not supervise the tenants, and received no financial benefit from the infringements. *Id.* (citing cases).

Under the other line of cases, the so-called "dance hall cases," the owners of nightclubs and similar establishments were held vicariously liable for the infringement of musical copyrights by bands performing at the club. The original basis for vicarious liability was founded on the employer-employee relationship between the club owner and the band, *see, e.g., M. Witmark & Sons v. Calloway,* 22 F.2d 412, 414 (E.D.Tenn.1927), but as the *Shapiro, Bernstein* court noted, "courts have not drawn a rigid line between the strict cases of agency, and those of independent contractor, license, and lease." 316 F.2d at 307. Indeed, the traditional agency standard of control over "manner and means" of performance appears to be irrelevant in these cases, and liability attaches "whether or not the proprietor has knowledge of the compositions to be played or any control over their selection." *Id.* (citing cases).

The court extracted from these cases the principle that, rather than following strict agency or independent contractor doctrines, courts should impose vicarious liability when the facts indicate that the defendant has the "right and ability to supervise" the infringer coupled with "an obvious and direct financial interest in exploitation of the copyrighted materials." *Id.* This two-pronged test has been widely adopted, although courts often refer to the two elements by the shorthand terms "control" and "benefit." *See, e.g., Demetriades,* 690 F.Supp. at 293 ("benefit and control are the signposts of vicarious liability").

The court in *Shapiro, Bernstein* was faced with a question similar to the one before this court: where along the spectrum of fact patterns from nightclub to landlord does the defendant stand? Applying the touchstones of benefit and control to the defendant in that case, a department store owner, the court concluded that the store should be held vicariously liable for the infringing sales made by a record concessionaire that operated on the store's premises. The court noted that the department store retained "the ultimate right of supervision" over the concessionaire and received a percentage of the profits generated from all sales. 316 F.2d at 308. This evidence of a "strong concern for the financial success" of the concession, coupled with the store's contractual ability to control the concession, satisfied the court that imposing vicarious liability on the de-

partment store would be just, and would best protect the interests of the copyright holder:

> [The department store] has the power to police carefully the conduct of its concessionaire, Jalen; our judgment will simply encourage it to do so, thus placing responsibility where it can and should be exercised.... Were we to hold otherwise, we might foresee the prospect—not wholly unreal—of large chain and department stores establishing "dummy" concessions and shielding their own eyes from the possibility of copyright infringement, thus creating a buffer against liability while reaping the proceeds of an infringement.

*Id.* at 308–09.

Like the court in *Shapiro, Bernstein,* I conclude that the defendant in this case, in its relation to the exhibitors, lies closer on the spectrum to the nightclub and department store than to the landlord. Indeed, although Interface's computer show may not evoke this image, another trade show organizer and its exhibitors might aptly fit the model foreseen by the Second Circuit of a large organization establishing "dummy" concessions that buffer the organization from liability for profitable infringements. Picture, for example, a fashion trade show at which each exhibitor played copyrighted music while its models walked the runway. If the organizer of this hypothetical trade show had contractual control over its exhibitors, arranged the audience for the exhibitors, and derived a profit from the exhibitors through rents, a cover charge, and advertising, it would be well within the precedents to hold the organizer vicariously liable for the copyright infringements of its exhibitors. Interface is in a position not materially different.

Before demonstrating how the elements of benefit and control apply to the facts of this case, I pause briefly to examine, first, the history and the policy justifications behind the legal theory of vicarious liability, second, a description of vicarious liability in the context of copyright infringement that appears in the House Report on the Copyright Act of 1976, and third, questions arising from the development of this view of vicarious liability for copyright infringement.

### B. *History of and Justification for Vicarious Liability*

The *Shapiro, Bernstein* court's inclusion of a policy justification for vicarious liability along with its discussion of the two elements of benefit and control reflects the now common recognition in other areas of the law that vicarious liability rests, in part at least, on a policy foundation relating to risk allocation. Even in copyright cases, in which the touchstones of benefit and control have become the defining elements for vicarious liability, we nevertheless are considering "the broader problem of identifying the circumstances in which it is just to hold one individual accountable for the acts of another." *Sony,* 464 U.S. at 435, 104 S.Ct. at 785.

The theory of vicarious liability developed from the law of agency, specifically employer-employee relationships, in which the "master" was held strictly liable for the torts of a "servant." Various legal concepts were fashioned to explain this liability, including the concepts of "control," "right to control," and "manner and means of performance." *See Restatement (Second) of Agency,* § 220(2).

Modern decisions, when explaining policy justifications for vicarious liability rather than merely citing precedent, commonly refer to risk allocation. When an individual seeks to profit from an enterprise in which identifiable types of losses are expected to occur, it is ordinarily fair and reasonable to place responsibility for those losses on the person who profits, even if that person makes arrangements for others to perform the acts that foreseeably cause the losses. The law of vicarious liability treats the expected losses as simply another cost of doing business. The enterprise and the person profiting from it are better able than either the innocent injured plaintiff or the person whose act caused the loss to distribute the costs and to shift them to others who have profited from the enterprise. In addition, placing responsibility for the loss on the enterprise has the added benefit of creating a greater incentive for the enterprise to police its operations carefully to avoid unnecessary losses.

This background of policy justifications for vicarious liability serves to place in context the two elements of benefit and control derived from the previous case law by the court in *Shapiro, Bernstein.* By focusing on benefit received from and control over an enterprise, a court can evaluate the defendant's ability to spread losses and police conduct within the enterprise, as well as the underlying fairness of holding the defendant liable.

The distinctive version of vicarious liability that has developed in the context of copyright omits the requirement, common elsewhere in the law of vicarious liability, that the right and ability to control extend to the "manner and means of performance." This distinctive variation is understandable, however, and is consistent with the policy foundations, as long as the right of control extends far enough to give the person (or entity) who is to be held vicariously liable a veto over performing any music at all, if authorization of the copyright holder can not be established.

## C. *Congressional Consideration of Vicarious Liability*

Although the Copyright Act does not explicitly refer to vicarious liability, Congress was aware when debating the 1976 amendments that the law had been interpreted as imposing vicarious liability on proprietors of nightclubs and other establishments for the infringements of musicians. *See* House Report of the Judiciary Committee, No. 94–1476, 159–60, ("House Report"), *partially reprinted in* Goldstein, *Copyright,* at 719 n. 2. In fact, the Judiciary Committee considered a proposed amendment to the Act that would have exempted such proprietors from vicarious liability. *Id.* The Committee decided, however, to reject the amendment because "no justification exists for changing existing law and causing a significant erosion of the public performance right." House Report, 160.

The Committee's statement of the "existing law" on imposing vicarious liability differs somewhat from the standard articulated in *Shapiro, Bernstein.* For a defendant to be held vicariously liable as an infringer under the House Report standard, the defendant

> must either actively operate or supervise the operation of the place wherein the performances occur, or control the content of the infringing program, and expect commercial gain from the operation and either direct or indirect benefit from the infringing performance.

House Report, 159–60. Unlike the *Shapiro, Bernstein* standard, this standard defines two types of control—either supervision over the operation as a whole, or control over the specific infringing performance—and allows for vicarious liability on a showing of *either* direct or indirect financial benefit. As explained below, I conclude that this definition more nearly captures the standard that is currently applied by the courts in copyright cases involving performances.

## D. *Questions about Vicarious Liability for Copyright*

 Although the court in *Shapiro, Bernstein* noted that the concept of vicarious liability in copyright law had departed from the analogous concept in the law of agency, it did not remark upon the altered roles for the court and the jury (or judge as fact-finder). Under the traditional law of agency, the existence of a master-servant relationship is ordinarily a question to be determined by the trier of fact under a multi-factored weighing test. *Restatement (Second) of Agency,* § 220, comment c. The court (except when acting as fact-finder) may decide the question only "[i]f the inference is clear that there is, or is not, a master and servant relation." *Id.*

In *Shapiro, Bernstein,* however, the Second Circuit established a different rule for copyright cases. In explaining its authority to reverse the district court's decision (reached after trial) to dismiss the complaint, the Second Circuit stated that the question of vicarious liability was a matter of law that could be decided *de novo* by the appellate court:

> When a District Court's determination of infringement hinges upon such purely factual questions as whether the defendant had access to the plaintiff's copyrighted materials and whether the physical acts of

copying or selling actually occurred, the scope of review on appeal is limited to determining if the District Court's conclusions are clearly erroneous. But where, as here, the facts are undisputed, and the issue of infringement depends merely upon a legal conclusion to be drawn from a consideration of the parties' relationship, we feel that an appellate court's power of review need not be so constrained.

*Shapiro, Bernstein,* 316 F.2d at 306–07 (internal citations omitted). After *Shapiro, Bernstein,* the great majority of courts have decided similar vicarious liability issues in copyright infringement actions on motions for summary judgment. *See, e.g., Gershwin Publishing Corp. v. Columbia Artists Man. Inc.,* 443 F.2d 1159, 1160 (2d Cir.1971) (affirming district court's grant of summary judgment after reviewing the "issue of law"); *RCA/Ariola Intern., Inc. v. Thomas & Grayston, Co.,* 845 F.2d 773, 781 (8th Cir.1988) (same); *Realsongs v. Gulf Broadcasting Corp.,* 824 F.Supp. 89, 93 (M.D.La.1993) (allowing partial summary judgment against radio station owners for infringing performance by independent singing group); *Boz Scaggs Music v. KND Corp.,* 491 F.Supp. 908, 913 (D.Conn.1980) (allowing summary judgment against radio station manager as vicariously liable for disc jockey's infringement).

 Although the use of summary judgment, in contexts other than copyright law, might be inappropriate to decide a case with a disputed agency question, decisions as a matter of law can be proper in copyright cases under the *Shapiro, Bernstein* standard for two reasons: the Second Circuit not only shifted the locus of decision-making from the jury to the court but also altered the test to be applied for a finding of vicarious liability. Under agency doctrine, the test for establishing a master-servant relationship is a multi-factored test, in which all factors are to be considered in combination. Under the *Shapiro, Bernstein* standard for imposition of vicarious liability, however, the test is an "elements" test, in which the court must evaluate facts to determine whether each and

every element (in this case, benefit and control) has been established. *See* Robert E. Keeton, *Judging* 93–95 (1990) (explaining distinctions between "multi-factored tests" and "elements tests").

The things that we call "factors" commonly have at least some kind of "fact" base, even if something more that is not entirely captured by the term "fact." This point has force not only as to "factors" but also as to "elements." For this reason, even in the context of an elements test, one may sense that the declaration that the determination of each element is purely a "matter of law" understates the extent to which the determinations made by the court include at least some element of evaluative weighing to reach a mixed law-and-fact determination. That is, a combination of facts and other factors, when evaluated together, lead the court to determine that a defendant had the requisite control over the direct infringer and that the defendant derived a direct financial benefit from the infringing activity. These evaluative determinations precede the court's conclusion that, as a matter of law, the defendant is vicariously liable.

After the decision in *Shapiro, Bernstein,* most courts, in cases involving nightclubs and similar establishments, have made these evaluative determinations and have then concluded "as a matter of law" that a defendant did or did not have the requisite control and benefit for imposition of vicarious liability. In these cases, the courts may have decided that reasonable persons, in making the evaluative determinations, could not have disagreed on the questions of control and benefit. When a court makes that kind of decision, it is permitted to make a "ruling" as a "matter of law." *See Judging,* p. 63.

In the case now before the court, however, I am not convinced that the evaluative determinations to be made must as clearly go the same way as in the nightclub cases: reasonable persons might differ in their evaluative determinations regarding alleged control and benefit in the context of trade shows generally, and this trade show particularly. For this reason, I have determined that the evaluative determination to be made in this case is a

reasonably disputable one, as to which reasonable decision-makers could disagree, rather than one that can be made as a "matter of law" in the sense that reasonable decision-makers could not disagree. My evaluative determinations for each element of vicarious liability are set forth below.

### E. *The Right and Ability to Supervise or Control*

In determining that a defendant meets the "control" (or "supervision") prong of the test for vicarious liability, courts have relied on a number of factors. The court in *Gershwin*, for example, relied on defendant CAMI's "pervasive participation" in an organization to conclude that CAMI had the requisite ability to supervise, despite its lack of "formal power to control" the infringers. *Gershwin Publishing*, 443 F.2d at 1163. In *Shapiro, Bernstein*, on the other hand, the court focused on the defendant's *contractual* ability to control its concessionaire. 316 F.2d at 306. Other factors on which courts have relied for their determination of "control" include:

defendant's name on a liquor license identifying her as the manager, *Broadcast Music*, 672 F.Supp. at 534;

defendant's letter to a trade association stating that it "policed" the activity now alleged to be infringing, *RCA/Ariola Intern*, 845 F.2d at 781;

defendant's responsibility for day-to-day operations, including refusal to purchase a music license, *Fermata Intern. Melodies v. Champions Golf Club*, 712 F.Supp. 1257, 1262 (S.D.Tex.1989), *aff'd*, 915 F.2d 1567 (5th Cir.1990) (table);

the fact that defendants were the primary individuals having the "right and ability to license" the infringing jukeboxes used by others, *Little Mole Music v. Spike Inv., Inc.*, 720 F.Supp. 751, 756 (W.D.Mo. 1989); and,

the fact of defendants' "ultimate authority" to control use of air time, whether or not they exercised it, *Realsongs*, 824 F.Supp. at 92.

Although the courts in these cases have not defined the precise terms of the test to be applied in determining whether a defendant had a "right and ability to supervise," it appears that these and other courts implicitly have adopted terms similar to those described in the legislative record of the amendments to the Copyright Act of 1976 (*see* Part IV(C), *supra*.). That is, defendants are found to have "control" over a performance if they "either actively operate or supervise the operation of the place wherein the performances occur, *or* control the content of the infringing program." House Report, 159–60 (emphasis added).

Taking into consideration this body of case law, I find, as a fact-finder engaged in adjudicative fact finding, that Interface had a right and ability to control and supervise its exhibitors, as those terms are used in the context of vicarious liability in copyright cases.

I base this finding in part on my evaluation of the weight and materiality of the stipulated facts that (1) Interface exercised authority and control over its exhibitors through its Rules and Regulations and (2) the exhibitors were bound to follow these rules. Also, I base this finding in part on my evaluation of the weight and materiality of the following facts drawn from submitted affidavits and depositions.

First, the vice-president of Interface, Richard Schwab, acknowledged in his deposition that Interface could have altered its Rules and Regulations to prohibit music at COMDEX/Fall, but it did not. (Dep. at 66). Instead, Interface chose only to prohibit music at levels that were intrusive to other exhibitors, and advised exhibitors to obtain proper licenses for any music they did play.

Second, Mr. Schwab states in his affidavit that during the COMDEX/Fall show, 10 to 12 Interface employees walked the aisles to ensure "rules compliance." (Aff. ¶ 8). Although Mr. Schwab believes it would be impractical to police the show for *all* rules violations, it is clear from Mr. Schwab's statement that Interface was actively involved in managing the show and did not function as an absentee landlord. For example, Interface employees were available during the show to address exhibitor needs and to answer exhibitor complaints, including

complaints about exhibitors encroaching on other space or blocking aisles during the show. (Aff. ¶¶ 8–9.)

Third, the COMDEX Rules and Regulations further demonstrate the extent of Interface's control over its exhibitors. Under these rules, Interface could restrict exhibits that "because of noise, method of operation, materials or any other reason become objectionable." (Exhibit 1, p. 2–2.) In addition, Interface reserved the right to police exhibitors during the show:

> Show Management may prohibit or remove any Exhibit which, in the opinion of Show Management, detracts from the general character of the Exposition as a whole, or consists of products or services inconsistent with the purpose of the Exposition.

> This reservation includes persons, things, conduct, printed matter and anything of a character which Show Management determines objectionable.

Exhibit 1, p. 2–2. Interface also exercised control over details such as the distribution of food and drink from booths, the design and construction of booths, and the use of video cameras. *Id.* pp. 2–3 to 2–22.

Based on my evaluation of all the evidence before me, I find that Interface actively supervised the COMDEX/Fall show where the five allegedly infringing performances occurred at exhibitor booths. In addition, I find that Interface had the contractual ability to control these allegedly infringing performances.

Interface's attempts to disclaim control and responsibility are not persuasive for several reasons.

First, the fact that Interface instructed exhibitors to comply with the copyright laws does not demonstrate a lack of control. Rather, it is compatible with an inference that Interface, though retaining and exercising control in fact, attempted to shift legal responsibility from itself to others. But like the race track owner who instructed his musicians not to play copyrighted music, Interface must shoulder responsibility when the instruction is not followed. *See, e.g., Famous Music Corp. v. Bay State Harness Horse Racing,* 423 F.Supp. 341, 342–43 (D.Mass. 1976), *aff'd* 554 F.2d 1213 (1st Cir.1977).

Second, although exhibitors rented booth space from Interface, Interface's assertion that it functioned merely in the relationship of a landlord to its exhibitors cannot withstand scrutiny. Interface not only rented space to the exhibitors, it also: (1) exercised a pervasive and continuing control over the exhibitors that was inconsistent with the usual relationship of landlord and tenant and was in accordance with a contract rather than a lease; (2) promoted the COMDEX/Fall show through advertising in order to develop an audience for the exhibitors; and (3) profited from the exhibitors not only through rents, but also by charging admission fees for those who wanted to view the exhibits. This level of participation and control resembles that of the show organizer in *Gershwin,* who was held vicariously liable for infringing performances of artists even though the organizer had no contractual control over the artists. In that case, the fact that the organizer created the audience for the infringing performances and "was in a position to police the infringing conduct" persuaded the court that the control element for the test of vicarious liability had been satisfied. *Gershwin,* 443 F.2d at 1163. I am similarly persuaded that sufficient control over the infringers exists in this case, especially in light of Interface's contractual control over the exhibitors.

 Interface's control over the performers at the awards ceremony presents a different issue. I find as an adjudicative fact that Interface did not have a contract with the performers and did not itself exercise any control over the performers. Plaintiffs' theory of liability is that, based on a written agreement in existence between BYTE Magazine and Interface and based on advertising stating that Interface was a co-sponsor of the awards ceremony, Interface should be held jointly and severally liable for the acts by BYTE Magazine and its agents, who obtained the band for the awards ceremony. I do not need to decide, however, whether under applicable law, Interface could be held liable on this basis. Two gaps in the evidence make it impossible to impose liability

on Interface, even if, on supporting evidence, Interface could be held liable for the acts of BYTE.

First, there is no evidence in the record showing who or what entity controlled or hired the disc jockey who performed at the awards ceremony. Without this evidence, neither Interface nor BYTE can be held vicariously liable for the disc jockey's actions. It is possible, for example, that the disc jockey was an employee and under the control of the Hilton Hotel, and not under the control of either BYTE or Interface. Because the record is devoid of any evidence from which I could reason to an evaluative finding of control, however, I cannot make that finding. I conclude that plaintiffs have failed to meet their burden of proof on this element of the test for vicarious liability. Liability for the acts of the disc jockey therefore can not be imposed on Interface.

Second, there is no evidence from which the court can determine which copyrighted songs were played by the disc jockey and which, if any, by the Jazz Barons. The stipulation of the parties simply states that certain songs were performed, without indicating which of the performers—the disc jockey or the Jazz Barons—did the performing. Because the evidence is insufficient for the court to find that the Jazz Barons performed any identified copyrighted song of the plaintiffs, the issue as to whether Interface might be vicariously liable for a performance of an identified copyrighted work by the Jazz Barons is moot.

## F. *Financial Benefit*

█ The second prong of the test for vicarious liability, as stated in *Shapiro, Bernstein*, requires that the defendant have a "direct financial interest in the exploitation of copyrighted materials." 316 F.2d at 307. As with determinations of "control," courts have not formulated an explicit test for determining whether a benefit to a defendant is "direct," perhaps in part because, as the case law demonstrates, it is difficult to define and measure the "direct" financial benefit that a performance of music confers.

For example, in cases interpreting the earlier Copyright Act that included a requirement that the infringing public performance be for *profit*, courts determined that profit could be *inferred* from the very fact of playing music in a profit-making establishment. *See, e.g., Herbert v. Shanley*, 242 U.S. 591 [37 S.Ct. 232, 61 L.Ed. 511] (1917) (Holmes, J.) (holding restaurant liable for infringements of orchestra even though no cover charge was paid by diners: "If music did not pay, it would be given up.... Whether it pays or not, the purpose of employing it is profit, and that is enough."); *Broadcast Music v. Larkin*, 672 F.Supp. 531, 534 (D.Me.1987) (including profit as a prima facie element and concluding that although no evidence was offered "to show that Defendants derived a pecuniary benefit from the public performance ..., the court may infer that this is true"); *Sailor Music v. Mai Kai of Concord, Inc.*, 640 F.Supp. 629 (D.N.H.1986) ("The performances were indisputably for defendants' profit as the music performed was an integral part of defendants' [restaurant] business; patrons had to pay a cover charge to hear performances, and defendants sold liquor during the performances."); *see also Merrill v. County Stores, Inc.*, 669 F.Supp. 1164, 1170 (D.N.H.1987) ("music was valued, presumably for its contribution to the Milford's store's ambience as a pleasant place in which to shop").

The primary formulation of the requirement that the financial benefit be "direct" appears in *Shapiro, Bernstein*, in which the infringement involved the sale of records rather than the performance of music. The court in that case was able to conclude that the defendant had a direct financial interest in the infringing activity based on defendant's receipt of a percentage of the sales. In cases involving the performance of music, however, courts have sometimes relied on an inferred, overall benefit that a performance of music confers on an establishment, rather than attempting to discern the "direct" benefit. For example, in *Realsongs*, the court held the owners of a radio station vicariously liable for the infringing performance of songs

by an independent group that had rented air time from the station. Defendants argued that they had no direct interest in the infringement because they were paid a flat rental fee that was unconnected to the content of the infringing performance, but the court rejected this argument:

> The courts have not interpreted the "direct financial interest" requirement so narrowly. Defendants still have a direct financial interest in the infringing activity if the station is a for-profit enterprise and defendants benefit from its operation.

824 F.Supp. at 92.

Similarly, in *Fermata Intern. Melodies,* the court relied on a benefit to the overall establishment in analyzing the "direct financial interest that [defendant] has in the infringing activity." 712 F.Supp. at 1262. Based on the defendant's receipt of a salary from, and his status as the majority shareholder in, the golf club at which an infringing musical performance took place, the court held defendant liable for the infringement. *See also Superhype Pub., Inc. v. Vasiliou,* 838 F.Supp. 1220, 1225 (S.D.Ohio 1993) (restaurant owner derived benefit because he was "sole owner"); *Swallow Turn Music v. Wilson,* 831 F.Supp. 575, 579 (E.D.Tex.1993) (same); *Sailor Music v. Mai Kai of Concord, Inc.,* 640 F.Supp. 629 (D.N.H.1986) (restaurant owner's salary is a direct financial benefit from infringing performances that generated income for restaurant).

Perhaps courts have assumed that music provides an overall benefit to an establishment and have avoided exploring the "direct" benefit from an exploited copyright because, in the particular case of music, the benefit from a performance, though clearly existing, is often unmeasurable. For example, it is widely accepted that restaurant owners may be held vicariously liable for infringing performances by musicians, but how many minutes of music per meal does it take to show that the financial benefit to a restaurant is "direct"? Or, as another example, in this circuit the infringing performances of a band resulted in liability for a race track owner that wanted to "entertain its patrons when they were not absorbed in watching the

races." *Famous Music,* 554 F.2d at 1214. If the vicarious liability standard of *Shapiro, Bernstein* were applied, would the adequacy of proof that the financial benefit is "direct" depend on evidence about the length of the musical interludes and how many patrons, if any, listened to the music?

Rather than purporting to measure the benefits of a musical performance and determine whether they are "direct," some courts, it appears, have implicitly adopted a position like that described in the legislative history of the 1976 amendments to the Copyright Act. Instead of rigidly requiring that a financial interest be "direct," these courts have imposed vicarious liability based on a determination that the defendants "expect commercial gain from the operation and either direct or indirect benefit from the infringing performance." House Report, 159–60. This two-part test—commercial gain from the overall operation and *either* a direct or indirect financial benefit from the infringement itself—serves to limit vicarious infringement to the activities of those who in some measure profit from the infringement, while at the same time defining the benefit from the infringing activity itself in a manner that allows the court to acknowledge the more intangible, indirect benefits from performances.

Having reviewed the case law, I find as an adjudicative fact that Interface derived a financial benefit from the infringing performances of its exhibitors, and that this benefit was of a kind that meets the requirement that it be "direct," in the sense in which that term appears in the cases that phrase the requirement as one of "direct financial benefit." I find also that Interface expected commercial gain from the COMDEX/Fall show and received from the performances by exhibitors a benefit of a kind called "direct" in some of the precedents, though more likely to be perceived as "indirect" by a person unfamiliar with the precedents.

I reach these evaluative findings for the following reasons: First, Interface expected commercial benefit from the COMDEX/Fall show and received over $44 million in gross revenues. Second, Interface's Trade

Show President Jason Chudnofsky acknowledged that at many other trade shows, music is an "integral part of the production." (Aff. ¶ 8). Although he does not believe music is important at COMDEX shows, I reach a different finding based on the deposition testimony of Richard Schwab, who asserted that banning music at COMDEX/Fall would be "a dramatic change from our standard operating procedure" and therefore would have been "non-competitive and unnecessarily irksome to exhibitors." (Dep. at 66). Third, I infer from Mr. Schwab's statement about communication that music may be used "to communicate with attendees" at the show. (Dep. at 83). Since communicating with attendees and cultivating their interest in one's products is the entire purpose for exhibitors at the trade show, I find that when music assists in this communication, it provides a financial benefit to the show of a kind that satisfies the financial benefit prong of the test for vicarious liability, just as music that enhances a meal provides that kind of benefit to a restaurant.

In an attempt to downplay the benefit that Interface might have derived from the exhibitors' performances of music, counsel for Interface argued at trial that the COMDEX/Fall show is "a professional trade show ... that's marked by no hoopla," and that the COMDEX/Fall show should be distinguished from other trade shows where one might expect to hear "song-and-dance numbers" and other "elaborate presentations." Transcript, Docket No. 63, p. I–97. The inference that counsel wishes this court to draw from the photographs and articles entered in evidence is that Interface could not have benefitted from any playing of music because the serious, computer professionals who attend the COMDEX/Fall show would not be interested in music.

I reject this suggested inference. Relying in part on my determination of premise facts about the nature of trade shows and their attendees and about the nature of marketing in general, I reach the opposite determination. *See Buirkle,* 832 F.Supp. at 471–72 (defining premise facts); *Judging,* 38–65. Even at a show for serious professionals, exhibitors will strive for an approach that

attracts attention to their booths. Those who make use of a multi-media approach, including the use of music, believe they benefit from doing so. In the community of serious professional endeavors, many examples can be found of use of the arts in marketing. One striking example is that the paradigm scholarly publication *Daedalus* has recently turned from a sober, traditional format to a brightly colored cover made possible by computer graphics. *See, e.g., Daedalus,* J.Am.Acad.Arts & Sciences, Winter 1994; *Daedalus,* J.Am.Acad.Arts & Sciences, Spring, 1994.

Furthermore, even without relying on premise facts about the nature of trade shows in general, I reach the same determination based on evidence in this case that belies Interface's claim that music was not an important part of COMDEX/Fall. Defendants' Exhibit B, a compilation of media reports about COMDEX/Fall, includes an article about COMDEX/Fall titled "Personal Impressions of COMDEX '91" that describes the trade show as follows:

> Most of the big manufacturers spend fortunes on talent—architectural, literary, musical, and performing—to assemble exhibits and shows which will flourish for only a mere five days before closing.... WordPerfect, for instance, to promote its new word-processing program called WordPerfect for Windows, produced a Wild–West minimusical, with costumed singing actors and dancing girls; it played to capacity audiences.
>
> \* \* \* \* \* \*
>
> The word "multimedia" dominated this year's COMDEX. On the one hand, a computer program installed in a fine Yamaha concert grand piano can reproduce—exactly—the performance just played on it by a great musician, with the sound coming not from loudspeakers but directly from the instrument's strings and sounding board. On the other hand, another program's computer-generated electronic sounds commit musical atrocities on the simple grace notes in Beethoven's Turkish March from "The Ruins of Athens."

Defendants' Exhibit B, Docket No. 55, Article, pp. 2–3. These first-hand impressions of

COMDEX/Fall completely undermine the claim that music was not used to benefit the COMDEX exhibitors or organizers.

Interface next contends that even if the show could have benefitted from the playing of music, the benefit in this case was nonexistent because copyrighted music was played by only "four" of the 2,000 exhibitors, who occupied only .002% of the total exhibition space. (Docket No. 40, p. 8). This attempt to quantify the benefit from music is not, by itself, persuasive. Even if only one exhibitor played music for only one hour, the benefit to Interface could be very substantial if, for example, the one hour of music was a live performance by the band most admired in the computer world. To determine the amount of benefit, a court would need evidence about the performances.

■■■ Before turning to an evaluation of the few facts that do appear in the record about the allegedly infringing performances, I note that the case law has not clearly defined what *amount* of benefit, as distinguished from the *existence* of a benefit, a plaintiff must establish in order to satisfy the benefit prong of the test for vicarious liability. It is true that the amount of benefit to a defendant is a factor for the court to consider when calculating an amount for statutory damages. *See, e.g., Rare Blue Music, Inc. v. Guttadauro,* 616 F.Supp. 1528 (D.Mass.1985). I conclude, however, that full assessment of the amount of benefit is not required to determine liability. The crucial question for establishing the benefit prong of the test for vicarious liability is not the exact amount of the benefit, but only whether the defendant derived a benefit from the infringement that was substantial enough to be considered significant.

■■■ Based on the lean record in this case, I find as an adjudicative fact that Interface derived a benefit from the exhibitors' music that was substantial enough to be considered significant in determining whether the financial benefit prong of the test for vicarious liability has been satisfied. In reaching this finding, I have relied on the stipulations of the parties that one exhibitor "continuously" played music on a video disc player connected to a stack of eight, large video monitors on which the performance could be observed (Stip. ¶ 44); one exhibitor played music in conjunction with a "display showing scenes of the desert on a four-foot by six-foot screen (Stip. ¶ 43); two other exhibitors used three to six video monitors in connection with the performance of music (Stip. ¶¶ 45–46); and each of these exhibitors played copyrighted music (Stip. ¶ 49). I find that these exhibitors performed music, some of it copyrighted, to attract attention to their booths, and that the exhibitors as well as Interface derived a significant financial benefit from the attention.

■■■ I do not address whether Interface derived a financial benefit from performances at the awards ceremony because, as explained in Part IV(E) above, plaintiffs did not enter evidence sufficient for a finding that the first prong of the test for vicarious liability has been met. Whether the plaintiffs are able to establish the second prong is therefore irrelevant. *See, e.g., Roy Export Company Establishment v. Trustees of Columbia University,* 344 F.Supp. 1350 (S.D.N.Y.1972) (failure to establish both prongs is fatal to claim).

## V. Contributory Infringement

Plaintiffs contend that Interface should be held liable as a contributory infringer for the allegedly infringing performances at the Best of COMDEX awards ceremony. Plaintiffs do not argue for imposition of contributory liability for any performances by the exhibitors.

■■■ The acknowledged standard for imposing contributory liability was articulated by the Second Circuit in *Gershwin Publishing Corp. v. Columbia Artists Man., Inc.,* 443 F.2d 1159 (2d Cir.1971):

> [O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a "contributory" infringer.

443 F.2d at 1162. This statement of the test for contributory liability has been widely followed. *See, e.g., Casella v. Morris,* 820 F.2d

362, 365 (11th Cir.1987); *Demetriades v. Kaufmann,* 690 F.Supp. 289, 294 (S.D.N.Y. 1988).

In addition, a defendant can be held contributorily liable for *authorizing* another to publicly perform a work without permission of the copyright owner. *See Danjaq, S.A. v. MGM/UA Communications, Co.,* 773 F.Supp. 194, 200–202 (C.D.Cal.1991), *aff'd* 979 F.2d 772 (9th Cir.1992).

■ The court cannot determine whether Interface should be held liable as a contributory infringer for performances at the awards ceremony, however, due to the same gaps in evidence explained above in Part IV(E). Because of the lack of evidence about the disc jockey, the court cannot find that Interface, by itself or through BYTE, induced, caused or materially contributed to the disc jockey's performance; the Hilton Hotel may have been completely responsible for the disc jockey. And, because the record does not distinguish between songs played by the disc jockey and those played by the band, there is no evidence that the band, as opposed to the disc jockey, played any identified infringing song. Without evidence that the band performed identified copyrighted songs of the plaintiffs, there is no reason for the court to examine whether Interface could be held contributorily liable for the performances, even if plaintiffs had met their burden of proof on the prima facie case of direct infringement.

## VI. Defenses

■ Interface argues that the exhibitors were necessary parties to this case because they may have been able to assert certain defenses, for example, "fair use," to excuse their use of the copyrighted music. Fair use is certainly an affirmative defense, *see Campbell v. Acuff–Rose Music, Inc.,* —— U.S. ——, ——, 114 S.Ct. 1164, ——, 127 L.Ed.2d 500 (1994), but this does not mean that the exhibitors were required parties. Under theories of agency and respondeat superior, the defenses of the servant may be asserted by the master; the servant is not a necessary party to the suit. *See Restatement (Second) of Agency,* § 219, comment (c). These same principles apply in this case. Furthermore, nothing in the language of the Copyright Act or in any of the cases interpreting it suggests that every infringer must be a party to the suit.

Thus, although the defense of fair use may have been available to Interface for the infringements by the exhibitors (for example, if they were playing music only to demonstrate audio equipment), Interface never entered any evidence in support of this defense. Under these circumstances, the defense fails.

## VII. Liability of Third Party Defendant

Third-party defendant McGraw–Hill has argued persuasively that the federal Copyright Act should not be construed to include the common law rights of contribution and indemnity, and that McGraw–Hill should therefore not be liable to Interface for contribution for any damages arising out of performances at the awards ceremony. The court need not decide this question, however, because, as explained above, the evidence was insufficient for a finding that Interface should be held liable on any basis for performances at the awards ceremony. Because Interface is not liable, there is no issue of contribution to be decided.

## VIII. Damages

■ The Copyright Act authorizes injunctive relief to the prevailing party in a copyright infringement case. 17 U.S.C. § 502(a). An injunction is appropriate if there is a "substantial likelihood of further infringement of plaintiffs' copyrights." *Milene Music, Inc. v. Gotauco,* 551 F.Supp. 1288, 1295 (D.R.I.1982). Courts routinely authorize injunctions in cases in which the owner of an establishment has, after repeated warnings by ASCAP that performances at the establishment violated the Copyright Act, nevertheless refused to purchase a license. *See, e.g., Id.; Famous Music Corp. v. Bay State Harness Horse Racing,* 423 F.Supp. 341 (D.Mass.1976), *aff'd,* 554 F.2d 1213 (1st Cir.1977).

■ This case presents different circumstances, however, because although Interface did repeatedly refuse to purchase a license from ASCAP, it had a good faith basis for believing that, under existing law, no license

was required. No injunction in these circumstances is warranted.

The Copyright Act also authorizes a court to award either actual damages, 17 U.S.C. § 504(b), or statutory damages ranging from $500 to $ 20,000, 17 U.S.C. § 504(c)(1), to a copyright holder whose copyright has been infringed. Plaintiffs in this case seek statutory damages in the amount of $5,000 for each of the ten infringements of copyright, for a total of $20,000 for the four songs performed at the awards ceremony and $30,000 for the six songs performed by the five exhibitors.

■■■■ The determination of statutory damages is left to the discretion of the trial court. *Rare Blue Music*, 616 F.Supp. at 1530. Among the factors for the court to consider in awarding damages are (1) expenses saved and profits reaped by the defendant, (2) revenues lost by the plaintiffs, (3) the deterrent value of the award, and (4) whether the infringement was willful or innocent. *Id.; see also Marvin Music Co.*, 830 F.Supp. at 656.

■■■■ Plaintiffs contend that Interface has saved $25,000 by refusing to purchase AS-CAP licenses for the COMDEX/Fall show and for all shows that have followed. (Docket No. 48, p. 25). This may be true, but the existing precedents during this time did not clearly require that Interface make those purchases. For this reason, I do not consider all the lost license fees in determining an appropriate award. For similar reasons, I do not consider any deterrent value that an award may have had.

In order to complete the record for appeal, and acting (contrary to my own determination) on the assumption that plaintiffs have proved a prima facie case so judgment should enter in their favor for six copyright infringements by the exhibitors, I find damages of $6,000 ($1,000 per infringement) to be appropriate. This finding is based on my assessment of the benefit that these songs provided to Interface and on the stipulation that, if Interface had purchased the proper license, it would have cost approximately $4,000 (Stip. ¶ 20).

## ORDER

For the foregoing reasons, the Clerk is directed to enter in a separate document a Final Judgment as follows:

For the reasons stated in the Opinion of this date, it is hereby ORDERED:

All claims against defendant NEVADA/TIG are dismissed by stipulation of the parties;

All claims against third-party defendant McGRAW–HILL, INC., are dismissed with prejudice;

Judgment for the Defendants INTERFACE GROUP MASSACHUSETTS, INC., and INTERFACE GROUP–NEVADA, INC., with costs.